DA 07-0114

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2007 MT 295

STATE OF MONTANA,

　　　　Plaintiff and Appellant,

　v.

ROBERT L. LEWIS,

　　　　Defendant and Appellee.

APPEAL FROM:　District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DC 2004-060
Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

　　　　For Appellant:

　　　　　　Hon. Mike McGrath, Montana Attorney General, Mark W. Mattioli,
Assistant Attorney General, Helena, Montana

　　　　　　Thomas P. Meissner, Fergus County Attorney, Lewistown, Montana

　　　　For Appellee:

　　　　　　Jeremy S. Yellin; Attorney at Law, Havre, Montana

　　　　　　　　Submitted on Briefs:　July 11, 2007

　　　　　　　　　　Decided:　November 8, 2007

Filed:

_____
　　　　　　　　Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 This is an interlocutory appeal by the State of Montana ("State") from two orders entered by the District Court for the Tenth Judicial District, Fergus County. The court's January 16, 2007 order suppressed physical and photographic evidence relevant to the State's prosecution of Robert Lewis ("Lewis") for felony arson. The court's January 26, 2007 order denied the State's request for reconsideration. We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

¶2 The dispositive issue on appeal is whether the District Court erred in granting Lewis's motion to suppress.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 On November 26, 2004, at 10:39 p.m., Fergus County Deputy Sheriff Larry McCord ("McCord") received a dispatch to respond to a structure fire north of Lewistown, Montana. The one-story structure contained two apartments, one of which had been rented by Lewis. Elizabeth Massey ("Massey"), the tenant in the other apartment, noticed smoke coming from Lewis's apartment around 10 p.m. and reported the fire. The following sequence of events ensued.

¶4 McCord arrived on the scene at 10:48 p.m. He was the first to respond to the fire, and when he arrived, Massey and her two children were the only other persons there. McCord asked Massey where the fire was and she directed him to the back of the structure. Through a window, McCord observed flames behind a wood stove in Lewis's apartment. McCord broke the window and reached through it to discharge his fire extinguisher onto the flames near the stove and also onto the flames coming from a

2

nearby vacuum cleaner. After his extinguisher was emptied, McCord borrowed another from Massey because the flames continued to flare up. He endeavored to suppress the blaze until Dick Hassler ("Hassler") with the Hilger Fire Department arrived.

¶5 The owner of the structure arrived at the scene and crawled through a broken window to unlock the door and allow McCord to enter. Hassler entered the structure along with McCord. Although there were no flames visible at that point, there was still a lot of smoke coming from the structure. Additionally, McCord observed smoldering embers inside the structure.

¶6 McCord later reported in his Incident Narrative that immediately upon entering the structure,

> I observed what I would call fuse [sic] on the table near the wood stove. The "fuses" were match books with cigarettes in them. One had burned and caught the matches on fire and the other had burned to the matches but had not ignited the matches. I observed what appeared to be toilet paper on one of the "fuses." On the table near the "fuses" was a roll of toilet paper.
>
> I also located a match/cigarette fuse on a bed in the same room. It had not been lit.

¶7 McCord testified at the hearing on Lewis's motion to suppress that, after entering the structure and upon seeing the matchbooks in plain view on the table and the bed, he went back to his patrol car to get a camera and then re-entered the structure to take pictures, after which he seized the evidence. McCord explained that he wanted to preserve the evidence and prevent it from being altered or damaged by efforts to suppress the fire. "I believe[d] or thought that the--with the Fire Department coming I didn't know how much water they were going to use. I didn't know what was going to happen so I

3

latched onto them, yes. I recovered them as evidence, yes." McCord then left the structure to deposit the evidence in his patrol car.

¶8 At some point after depositing the evidence in his car, McCord called Sheriff Killham with the Fergus County Sheriff's Office to report that Lewis's residence was a possible crime scene. Approximately seventeen minutes later, a crew from the Lewistown Rural Fire Department arrived and entered Lewis's residence. The fire crew removed some ceiling tiles in the kitchen area because they were concerned that the fire may have spread into the ceiling. McCord re-entered the structure after the Lewistown firefighters had removed the ceiling tiles. In his Incident Narrative, he explained:

> I went back into the residence to look for further evidence. I located several match books on the kitchen counter and a cigarette lighter on the divider and I took them for evidence. An alcohol bottle was located on the divider and had what appeared [to be] fingerprints on it. I took it for evidence and placed it into my patrol vehicle.

McCord later testified that he had "collected the wine bottle for the fingerprints on it." Additionally, McCord testified that he had entered the structure at least four times that evening.

¶9 On December 22, 2004, the State charged Lewis with felony arson and criminal mischief. The State subsequently filed an Amended Information, adding a charge of solicitation for assault. The State alleged that Lewis had offered to pay an inmate in the Fergus County Jail to hurt or kill his former landlady.

¶10 On October 3, 2006, Lewis filed a motion to suppress the evidence obtained by McCord. Lewis did not contest McCord's initial entry; indeed, he conceded that McCord was justified in entering the structure to put out the fire. However, he claimed that, after

4

the fire was put out, McCord unlawfully re-entered the structure in order to gather evidence. Lewis argued that McCord's second and subsequent entries had to be justified separately because they were separate entries. He further argued that there were no exceptions to the warrant requirement for McCord's second and subsequent entries and searches. Thus, according to Lewis, McCord was required to apply for a search warrant with supporting probable cause before re-entering the structure and invading Lewis's privacy.

¶11 In response, the State argued that McCord was not required to obtain a search warrant. First, McCord had the right to enter the structure to suppress the fire. Second, according to the State, exigent circumstances prompted McCord's re-entries and subsequent searches and provided an exception to the warrant requirement. Third, the State also maintained that the plain view doctrine provided another exception to the warrant requirement. Lastly, the State contended that Lewis had abandoned his residence and, therefore, could not claim that his constitutional rights had been violated.

¶12 The District Court issued an order on Lewis's motion on January 16, 2007. The court stated that "[u]nequivocally, exigent circumstances existed for [McCord's] first entry." The court also noted that "[d]uring this first entrance, Deputy McCord observed 'fuses' on the table (match books with cigarettes in them), toilet paper with one of the fuses, and a match/cigarette fuse on a bed in the same room." According to the court, because "[t]hese first observations satisf[ied] the exigent circumstances exception to a warrantless search," and because these items "were in plain view," the "Motion to Suppress with regard to these first visit observations is **Denied**."

¶13 Regarding McCord's second entry into the structure, the court stated that the photographic and physical evidence obtained during this entry "poses a more difficult analysis." According to the court, testimony clearly reflected that the purpose of McCord's second visit was "to memorialize with pictures those pieces of evidence observed in visit one. Consequently, that visit, despite some testimony about additional fire danger spotted during the second visit, does not fall under the exceptions and required a search warrant." Further, the court reasoned that the purpose of McCord's third and fourth visits was to gather evidence and that each successive visit reflected "the lack of exigency existing in visit two." Therefore, the court granted Lewis's motion to suppress "with regard to evidence seized or obtained in visits two, three and four."

¶14 The State filed a motion for reconsideration on January 24, 2007. The State argued that the District Court's decision was "internally inconsistent" and that the court's legal basis for suppression was "not judicially recognized." According to the State, because the District Court noted that McCord's first entry was justified by exigent circumstances and that the purpose of McCord's second entry was to preserve evidence, exigent circumstances certainly justified McCord's second entry. The State questioned why, if the fuses were in plain view when McCord entered for the first time, their seizure upon McCord's second entry was unlawful. The State argued that the District Court had ignored this Court's analysis in *State v. Bassett*, 1999 MT 109, 294 Mont. 327, 982 P.2d 410, when it analyzed the facts of the case at hand, even though both parties had relied on *Bassett* in their respective arguments. Lastly, the State argued that the court had ignored or misread the authority cited by the State on the issue of abandonment.

6

¶15 On January 26, 2007, the District Court issued an order on the State's motion for reconsideration. The court stated that it

> did not suppress evidence obtained during the deputy's first foray into the fire scene/home because the fireman (Dick Hassler) accompanying the deputy saw smoke and clearly testified that entrance was necessary to assess and control. However, no such "emergency" or "exigency" existed on subsequent visits. Regardless of the deputy's intentions . . . , his subsequent re-entries did not rise to the level of suppression or assessment – he wanted to memorialize the evidence seen in the first visit. A search warrant was required for that purpose. *Michigan v. Tyler* (1978), 436 U.S. 499, 98 S.Ct. 1942.

Thus, the District Court denied the State's motion for reconsideration.

¶16 The State now appeals.

## STANDARD OF REVIEW

¶17 We review a district court's decision to grant or deny a motion to suppress to determine whether the court's underlying findings of fact are clearly erroneous and whether the court correctly interpreted and applied the law to those findings. *State v. DeWitt*, 2004 MT 317, ¶ 21, 324 Mont. 39, ¶ 21, 101 P.3d 277, ¶ 21; *State v. Lanegan*, 2004 MT 134, ¶ 10, 321 Mont. 349, ¶ 10, 91 P.3d 578, ¶ 10; *State v. Bassett*, 1999 MT 109, ¶ 17, 294 Mont. 327, ¶ 17, 982 P.2d 410, ¶ 17. A trial court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been made. *Lanegan*, ¶ 10.

## DISCUSSION

¶18 *Did the District Court err in granting Lewis's motion to suppress?*

7

¶19    The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect individuals against unreasonable searches and seizures.  The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.  The Fourth Amendment thus gives concrete expression to a right of the people which 'is basic to a free society.' " *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730 (1967) (quoting *Wolf v. Colorado*, 338 U.S. 25, 27, 69 S. Ct. 1359, 1361 (1949)).

¶20    "Montana has a strong tradition of respect for the right to individual privacy." *State v. Bullock*, 272 Mont. 361, 383, 901 P.2d 61, 75 (1995).  Article II, Section 11 of the Montana Constitution provides:

> The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures.  No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

Further, Article II, Section 10 of the Montana Constitution provides:  "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."  Our unique constitutional language affords Montanans a greater right to privacy and, therefore, broader protection

than does the Fourth Amendment to the United States Constitution in cases involving searches of, or seizures from, private property. *Bassett*, ¶ 42 (citing *State v. Hubbel*, 286 Mont. 200, 211, 951 P.2d 971, 977 (1997)); *Bullock*, 272 Mont. at 384, 901 P.2d at 75; *State v. Sawyer*, 174 Mont. 512, 515, 571 P.2d 1131, 1133 (1977), *overruled in part on other grounds*, *State v. Long*, 216 Mont. 65, 67, 71, 700 P.2d 153, 155, 157 (1985). It is well-settled that a person retains a "reasonable privacy interest in his home even when it has been damaged by fire." *Bassett*, ¶ 26.

¶21 Warrantless searches and seizures are per se unreasonable absent a few carefully drawn exceptions. *State v. Shaw*, 2005 MT 141, ¶ 7, 327 Mont. 281, ¶ 7, 114 P.3d 198, ¶ 7; *State v. Elison*, 2000 MT 288, ¶ 39, 302 Mont. 228, ¶ 39, 14 P.3d 456, ¶ 39; *accord Payton v. New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable" (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477, 91 S. Ct. 2022, 2044 (1971))). One such exception is the existence of exigent circumstances. "Exigent circumstances for conducting a warrantless search exist 'where it is not practicable to secure a warrant.' " *Bassett*, ¶ 47 (quoting *State v. McCarthy*, 258 Mont. 51, 57, 852 P.2d 111, 114 (1993)). We have defined exigent circumstances as "those circumstances that 'would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other person, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " *State v. Gomez*, 2007 MT 111, ¶ 24, 337 Mont. 219, ¶ 24, 158 P.3d 442, ¶ 24 (quoting *Cassady v.*

9

*Yellowstone County Sheriff*, 2006 MT 217, ¶ 33, 333 Mont. 371, ¶ 33, 143 P.3d 148, ¶ 33); *accord Bassett*, ¶ 47 ("In determining whether exigent circumstances exist, the court considers factors such as the possible destruction of evidence, the mobility of the evidence, the safety of police officers, the gravity of the crime, and other emergency situations.").

¶22    Also relevant here is the plain view doctrine, which "allows peace officers, under certain circumstances, to seize evidence in plain view without a warrant." *State v. Loh*, 275 Mont. 460, 468, 914 P.2d 592, 597 (1996). If, while a law enforcement officer is lawfully present on an individual's property, and in the course of his or her lawful presence, the officer discovers evidence in plain view, and if its incriminating nature is "immediately apparent," then that evidence may be seized and used against the defendant at trial. *DeWitt*, ¶ 25; *Bassett*, ¶ 52; *State v. Weaselboy*, 1999 MT 274, ¶ 23, 296 Mont. 503, ¶ 23, 989 P.2d 836, ¶ 23; *Loh*, 275 Mont. at 473, 914 P.2d at 600.

¶23    We have, on occasion, suggested that the plain view doctrine is an exception to the warrant requirement for searches. *See e.g. State v. Copelton*, 2006 MT 182, ¶ 15, 333 Mont. 91, ¶ 15, 140 P.3d 1074, ¶ 15; *State v. Delao*, 2006 MT 179, ¶ 15, 333 Mont. 68, ¶ 15, 140 P.3d 1065, ¶ 15; *State v. Pierce*, 2005 MT 182, ¶ 17, 328 Mont. 33, ¶ 17, 116 P.3d 817, ¶ 17; *DeWitt*, ¶ 25; *State v. Snell*, 2004 MT 269, ¶ 14, 323 Mont. 157, ¶ 14, 99 P.3d 191, ¶ 14; *State v. Logan*, 2002 MT 206, ¶ 14, 311 Mont. 239, ¶ 14, 53 P.3d 1285, ¶ 14; *State v. Elison*, 2000 MT 288, ¶ 54, 302 Mont. 228, ¶ 54, 14 P.3d 456, ¶ 54; *Weaselboy*, ¶¶ 21-22; *State v. Doyle*, 1998 MT 195, ¶ 11, 290 Mont. 287, ¶ 11, 963 P.2d 1255, ¶ 11; *Loh*, 275 Mont. at 468, 914 P.2d at 597; *State v. Romero*, 224 Mont. 431,

436, 730 P.2d 1157, 1160 (1986). This characterization, however, is inaccurate for the following reasons.

¶24 Unlike exigent circumstances, valid consent, and lawful arrest, "plain view" does not permit the officer to proceed or intrude without a warrant to the location of the evidence in question. To the contrary, the doctrine's applicability *depends* on the officer's lawful presence and right of access to the evidence. We explained this requirement in *State v. Olson*, 2002 MT 211, 311 Mont. 270, 55 P.3d 935, as follows:

> [B]ecause the [plain view] doctrine presupposes the law enforcement officer was lawfully on the premises at the time the evidence is observed, *the doctrine authorizes the seizure of—rather than the search for—evidence without a warrant*. To justify seizing evidence under the plain view doctrine, a law enforcement officer must be lawfully located in a place from which the evidence can be plainly seen, the incriminating nature of the evidence must be immediately apparent and the officer must have a lawful right of access to the object.

*Olson*, ¶ 10 (emphasis added). Thus, the plain view doctrine should not be misconstrued as a "stand-in" for a search warrant. Rather, as we explained in *Olson*, it permits the *seizure* of evidence that otherwise could not be seized without a warrant—so long as the evidence can be plainly seen by the officer, the incriminating nature of the evidence is immediately apparent, and the officer has a lawful right of access to the evidence.

¶25 Addressing this issue in *Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301 (1990), the Supreme Court observed:

> A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property. The "plain-view" doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its

seizure would involve any invasion of privacy. A seizure of the article, however, would obviously invade the owner's possessory interest.

*Horton*, 496 U.S. at 133-34, 110 S. Ct. at 2306 (citations and footnotes omitted); *accord Delao*, ¶ 21 ("The plain view doctrine simply recognizes that if an article is in plain view, neither its observation nor its seizure involves any invasion of privacy; rather, a seizure of the article involves an invasion only of the owner's possessory interest."); *see also Horton*, 496 U.S. at 133 n. 5, 110 S. Ct. at 2306 n. 5 (" 'It is important to distinguish "plain view," as used in *Coolidge* to justify *seizure* of an object, from an officer's mere observation of an item left in plain view. Whereas the latter generally involves no Fourth Amendment search, [citations], the former generally does implicate the Amendment's limitations upon seizures of personal property.' " (quoting *Texas v. Brown*, 460 U.S. 730, 738 n. 4, 103 S. Ct. 1535, 1541 n. 4 (1983) (Opinion of Rehnquist, J.))). Therefore, the Supreme Court concluded that "[i]f 'plain view' justifies an exception from an otherwise applicable warrant requirement, . . . it must be an exception that is addressed to the concerns that are implicated by *seizures* rather than by searches." *Horton*, 496 U.S. at 134, 110 S. Ct. at 2306 (emphasis added). We, likewise, will henceforth refer to the plain view doctrine as an exception to the warrant requirement applicable to seizures, not searches.

¶26 With these principles in mind, we now turn to the State's appeal.

¶27 At the outset, we note that Lewis's motion to suppress was directed at the following evidence seized by McCord: two matchbooks, cigarettes, and toilet paper located on the table; a matchbook and cigarette located on the bed; and four matchbooks,

an empty wine bottle, and a cigarette lighter located in the kitchen area. The District Court suppressed all of this evidence. While we agree with the District Court's ruling with respect to the evidence seized from the kitchen area, we disagree with the court's ruling with respect to the evidence seized from the table and the bed. We thus will examine these groups of evidence in turn.

### The Evidence Seized from the Table and the Bed

¶28 McCord first observed the evidence seized from the table and the bed during his initial entry. Neither Lewis nor the State disputes that this entry, prompted by the exigent circumstance of a fire, was lawful. Indeed, we recognized in *Loh* that

> "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze."

*Loh*, 275 Mont. at 474, 914 P.2d at 601 (quoting *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S. Ct. 1942, 1950 (1978), in turn citing *Coolidge v. New Hampshire*, 403 U.S. 443, 465-66, 91 S. Ct. 2022, 2037-38 (1971)).

¶29 It is also undisputed that the evidence McCord observed on the bed and the table was in plain view. Thus, contrary to the District Court's analysis, the initial entry and McCord's observations of the evidence on the table and the bed did not constitute a "search." Finally, no one disputes that the incriminating nature of the pieces of evidence was "immediately apparent" in the context of the surrounding circumstances. Thus, McCord was entitled to seize the evidence on the bed and the table during the course of his initial entry. *See e.g. Delao*, ¶ 15. He did not do so, however. Rather, he seized this

evidence on his *second* entry. The question, therefore, is whether he could do so lawfully without a warrant.

¶30 The State maintains that McCord's second entry into the structure after he went to his patrol car to retrieve his camera was merely a continuation of his initial entry. Approximately two minutes passed between the time that McCord left the structure, retrieved his camera from his patrol car, and re-entered the structure. Therefore, the State contends that McCord's "reentry to photograph and seize the evidence was nearly contemporaneous with his initial plain view observations."

¶31 In response, Lewis contends that McCord's second entry was not a continuation of his first entry; rather, he maintains that it was an entirely separate entry. In this regard, Lewis directs our attention to ¶ 41 of *Bassett*, where we stated that "[i]n this case, there were two separate reasons for entering the house, and there thus must be two entirely separate justifications for each entry." Based on this language, Lewis argues that because there was a separate entry by McCord, there must be a separate justification for that second entry. Lewis reasons that if McCord was concerned about the destruction of evidence by efforts to suppress the fire, he should have seized the items during his initial entry. Additionally, Lewis maintains that McCord had "limited, if any knowledge about fires, or fire investigation. Both Hassler, and the Lewistown Assistant Fire Chief testified that they try (tried) to keep the scene intact when doing suppression." Thus, according to Lewis, McCord's "concern about destruction of evidence was based upon speculation."

¶32 We agree with the State that McCord's seizure of the table and bed evidence during the course of the second entry was lawful for the following two reasons. First, we

14

observe that exigent circumstances existed to justify McCord's second warrantless entry and the corresponding seizure. "Exigent circumstances are those circumstances that 'would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other person, *the destruction of relevant evidence*, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " *Cassady*, ¶ 33 (emphasis added) (quoting *State v. Anyan*, 2004 MT 395, ¶ 34, 325 Mont. 245, ¶ 34, 104 P.3d 511, ¶ 34). McCord testified that he believed that efforts by the Lewistown Rural Fire Department to suppress the fire could destroy the evidence he had observed on the table and the bed because "I didn't know how much water they were going to use. I didn't know what was going to happen." Given these circumstances, we hold that it was reasonable for McCord to believe that efforts to suppress the fire might destroy the relevant evidence that he had observed in plain view and, thus, that exigent circumstances justified his second entry and the seizure of the evidence. In reaching this conclusion, we reject Lewis's suggestion that McCord needed to have special knowledge about firefighting or fire investigation in order to ascertain whether there was a risk that the evidence would be destroyed. The standard is what a "reasonable person" would believe under the circumstances; and under the circumstances presented here, a reasonable person would believe that entry into the structure was necessary to prevent the destruction of the evidence on the table and the bed.

¶33 Second, we agree with the State that McCord's second entry was a continuation of his initial entry into the structure. McCord was lawfully in the structure, the evidence on

15

the bed and the table was in plain view, and the incriminating nature of the evidence was immediately apparent. However, the incriminating nature of the evidence was only apparent when viewed as it was arranged on the table and the bed. More specifically, it was the strategic positioning of the cigarettes inside the matchbooks and the location of the toilet paper, which together appeared to be a "fuse," that made this evidence immediately incriminating. Had McCord simply collected the evidence upon his first visit, the incriminating nature of the evidence would have been destroyed. Thus, it was appropriate for him to photograph the evidence before seizing it. Additionally, according to McCord's approximation, only two minutes passed between the time that he left the structure after his initial entry and the time that he re-entered. Finally, we note that McCord did not seize or photograph any more evidence than he had observed during his initial entry. Thus, we conclude that McCord's second entry was not "clearly detached from the initial exigency and warrantless entry," *Tyler*, 436 U.S. at 511, 98 S. Ct. at 1951, and we hold that McCord's second entry, therefore, was a continuation of his initial entry.

¶34   For these reasons, we reverse the District Court's order granting Lewis's motion to suppress the evidence obtained by McCord during his second entry into the structure— namely, the physical evidence seized from the bed and the table and McCord's photographs of that evidence.

### The Evidence Seized from the Kitchen Area

¶35   In its reply brief on appeal, the State notes that it would have gone to trial without seeking review in this Court of the District Court's orders had the District Court not

16

suppressed the evidence seized from the table and the bed. That said, the State then proceeds with an argument concerning the suppression of the evidence seized from the kitchen area. Thus, we will evaluate whether the District Court erred in granting Lewis's motion to suppress with respect to this evidence.

¶36 The State argues that "McCord's subsequent seizures and photographs were permissible because, like McCord's reentry to photograph the fuses before seizing them, they were a continuation of McCord's initial, lawful entry." According to the State, "McCord was at the scene for only about two and [sic] half hours," and, consequently, the State maintains that McCord's investigation lasted a reasonable period of time. Therefore, the State argues that the District Court erred when it suppressed the evidence seized by McCord from the kitchen area.

¶37 In response, Lewis maintains that our decision in *Bassett* controls in this case. Again, we stated in *Bassett* that "there were two separate reasons for entering the house, and there thus must be two entirely separate justifications for each entry." *Bassett*, ¶ 41. Lewis also contends that "[i]f law enforcement is not allowed on the premises, it matters not what law enforcement is investigating." Essentially, Lewis argues that McCord's third and subsequent entries were not continuations of his first, lawful entry. Therefore, according to Lewis, the District Court properly suppressed the evidence obtained by McCord from the kitchen area.

¶38 We observe that at the time of McCord's third entry, the fire had been suppressed and the cause and location of the fire had been determined. Thus, McCord's search of the kitchen area could only have been a search to gather evidence of criminal activity.

17

Indeed, the purpose of McCord's third and subsequent entries into the structure was, according to his Incident Narrative, "to look for further evidence." In this regard, we also note that before McCord re-entered the structure for the third time, he notified Sheriff Killham that Lewis's residence was a possible crime scene. As a matter of fact, McCord testified that he "collected the wine bottle [from the kitchen area] for the fingerprints on it." Therefore, unless McCord's third and subsequent warrantless entries were continuations of his earlier lawful entries, or unless exigent circumstances existed to justify these entries, the entries and corresponding searches required a warrant. *See Bassett*, ¶ 41.

¶39 With respect to continuation, we note that McCord's *second* entry was a continuation of his initial entry for the purpose of documenting the incriminating nature of the evidence observed in plain view on the table and the bed, seizing that evidence, and placing it in his patrol car. The same, however, cannot be said of McCord's third and subsequent entries. As McCord stated in his Incident Narrative, the purpose of his third and subsequent visits was "to look for further evidence"—i.e., evidence of which he was not yet aware. By this point, McCord had already determined that Lewis's residence was a possible crime scene. Therefore, McCord's third entry was "clearly detached" from the initial exigency and warrantless entry, *Tyler*, 436 U.S. at 511, 98 S. Ct. at 1951, and constituted a separate entry, not a continuation of his initial and second entries.

¶40 A separate entry to search for and gather evidence pursuant to a criminal investigation requires a separate justification, such as a warrant, consent, or an exigency. *See Bassett*, ¶ 41. The State claims that an exigency existed here—namely, that fire

suppression efforts were ongoing. Even if this assertion is factually accurate, however, it is entirely inapposite because McCord was not participating in efforts to suppress the fire. In point of fact, McCord noted in his Incident Narrative that while his second foray into the structure was to preserve and collect evidence that might have been damaged by efforts to suppress the fire, the purpose of his third and subsequent visits was "to look for further evidence." Furthermore, we note that while a concern for the destruction of evidence is an exigent circumstance that provides an exception to the warrant requirement, McCord had already retrieved the evidence that he was concerned might be destroyed. Therefore, McCord's search of the kitchen area and his subsequent seizure of the evidence from the kitchen area were not justified by an exigent circumstance.

¶41 The Dissent contends that McCord's third and subsequent warrantless entries were due to an exigency—namely, "to prevent further evidence from being destroyed or displaced by firefighters." This contention, however, is not supported by the record. After McCord photographed the evidence on the table and the bed during his second entry, he exited the apartment and deposited this evidence in his car. He did not then re-enter the structure to prevent evidence from being destroyed or displaced. Rather, *approximately seventeen minutes later*, a crew from the Lewistown Rural Fire Department arrived. The fire crew entered Lewis's residence and removed some ceiling tiles in the kitchen area to ascertain whether the fire had spread into the ceiling. At some point thereafter, McCord re-entered the structure—as he candidly admitted—"to look for further evidence." The totality of these record-based facts simply does not support the view that McCord's third and subsequent entries were designed "to prevent further

19

evidence from being destroyed or displaced by firefighters." Quite the contrary, it establishes that no such exigency existed. McCord waited well over seventeen minutes, and until *after* the firefighters had directed their efforts to the kitchen area, to look for evidence in that area. Moreover, as noted above, the fire had been suppressed and the cause and location of the fire had been determined by the time of McCord's third entry. Thus, McCord's search of the kitchen area was not justified by an exigency.

¶42 The Dissent also argues that McCord's third and subsequent entries were justified because they were all part of his "brief" arson investigation. As just noted, however, the cause of the fire—the "fuse" on the table—and the location of the fire—behind the wood stove and a nearby vacuum cleaner—had already been ascertained and documented. Moreover, there is nothing in the record to suggest that by the time of his third entry, circumstances precluded McCord from applying for a search warrant, and we reject the Dissent's suggestion that warrantless entries into burned structures are per se lawful if the officer is merely trying to ascertain the cause of the fire. It is well-settled that a person retains a privacy interest in his home even when it has been damaged by fire. *Bassett*, ¶ 26.

¶43 We agree with Lewis and the District Court that McCord's searches beginning with the third entry were unlawful. We therefore affirm the District Court's suppression of evidence with respect to the matchbooks, wine bottle, and cigarette lighter seized in the kitchen area upon McCord's third and subsequent visits to the structure.

¶44 Before concluding, it is necessary to address the State's contention concerning abandonment. In its response to Lewis's motion to suppress, the State argued that Lewis

had "abandoned the property and cannot now claim that his constitutional rights were violated." However, the State does not raise this as a separate issue on appeal. The State merely addresses the issue of abandonment in one sentence, as follows: "Because McCord's entry was lawful, the seizure of the items did not implicate a privacy interest. *Rather, the seizure implicated only Lewis's right to dominion over personal property of negligible value (cigarettes, matchbooks, toilet paper) which the owner had ostensibly abandoned*" (emphasis added). This is wholly insufficient to raise an issue on appeal. " 'Under Rule 23, M.R.App.P., it is not this Court's obligation to conduct legal research on appellant's behalf, to guess as to his precise position, or to develop legal analysis that may lend support to his position.' " *State v. St. Germain*, 2007 MT 28, ¶ 41 n. 1, 336 Mont. 17, ¶ 41 n. 1, 153 P.3d 591, ¶ 41 n. 1 (quoting *In re Estate of Bayers*, 1999 MT 154, ¶ 19, 295 Mont. 89, ¶ 19, 983 P.2d 339, ¶ 19). Therefore, we will not address the question of abandonment.

## CONCLUSION

¶45     In summary, we reverse the District Court's grant of Lewis's motion to suppress with respect to the evidence seized by McCord from the table and the bed and McCord's photographs of that evidence. This evidence was observed by McCord in plain view during his lawful initial entry, and his second entry to photograph and seize the evidence was justified by an exigent circumstance and, in addition, was a continuation of his initial entry.

¶46     However, we affirm the District Court's grant of Lewis's motion to suppress with respect to the evidence seized in the kitchen area during McCord's third and subsequent

21

warrantless entries and searches. A separate entry to search for and gather evidence pursuant to a criminal investigation requires a separate justification, such as a warrant, consent, or an exigency. No such justification existed here.

¶47 Affirmed in part, reversed in part, and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Justice Jim Rice concurs in part and dissents in part.

¶48 I concur with the Court's conclusion that evidence photographed and seized by McCord on his first and second visits into the structure was improperly excluded by the District Court and join in reversing the District Court on those grounds. However, I dissent from the Court's conclusion that McCord's third and subsequent entries into the structure were not continuations of his initial entry and justified by exigent circumstances, and would likewise reverse this holding of the District Court.

¶49 "In assessing exigent circumstances, we have said that the court must consider the totality of such circumstances." *State v. Lanegan*, 2004 MT 134, ¶ 16, 321 Mont. 349, ¶ 16, 91 P.3d 578, ¶ 16. Here, the Court ignores the continuous nature of McCord's presence at the "crime scene," characterizes McCord's third and subsequent entries into the structure as though they were a fishing expedition for some smoking gun, and reaches

a result that is impractical and unrealistic in the context of a rural arson investigation. Exigent circumstances justified McCord's initial entries, and the totality of the circumstances indicates that McCord's subsequent entries were also mere continuations of the first two entries.

¶50 The Court has failed to acknowledge obvious distinctions between *Bassett* and the present case. In *Bassett*, a fire broke out at a residential home during the middle of the night, and firefighters fought the blaze until the following morning. Law enforcement officers were not present and played no role in the fire suppression efforts. *Bassett*, ¶ 6. However, while the firefighters were "mopping up," they discovered a florescent light and marijuana plants in the defendant's bedroom closet. They reported their findings to the sheriff's office, and a deputy sheriff arrived at the home shortly thereafter. *Bassett*, ¶¶ 8-9. By the time the deputy sheriff arrived, the fire was extinguished, no fire fighting equipment remained, the firefighters had all been released, and the assistant fire marshal had installed fire line tape around the defendant's home to keep people away. *Bassett*, ¶ 10. Despite his later admission that no pressing reason or exigency existed to prevent him from obtaining a search warrant, the deputy sheriff entered the home and seized the plants, equipment, and supplies. *Bassett*, ¶ 11.

¶51 The defendant moved to suppress the fruits of the deputy sheriff's search. We relied on language from the Ninth Circuit's holding in *United States v. Hoffman*, 607 F.2d 280 (9th Cir. 1979), which stated:

> [The police officer's] only purpose in entering appellant's trailer, as he forthrightly admitted, was to seize evidence of an unrelated federal crime. . . . One whose home is ablaze certainly should expect that firemen will

> enter in order to extinguish the fire. Likewise, one should also expect that these same firefighters will be looking for the source or cause of the fire while within the home. But, no citizen should reasonably expect that, because a fire has occurred in his home, and certain few officials may enter, any sort of public officer may thereafter invade his home *for purposes unrelated to that intrusion*.

*Hoffman*, 607 F.2d at 284-85 (internal citations omitted) (emphasis added). In adopting the analysis from *Hoffman*, we reiterated that simply because firefighters enter a home to extinguish a fire does not mean that other government officers may enter the home to search for evidence of unrelated criminal activity. *Bassett*, ¶ 37. Moreover, we emphasized that "[b]ecause the fire appeared to be extinguished and there was no imminent danger that the evidence would be destroyed, this was not a situation where it was impracticable to obtain a warrant." *Bassett*, ¶ 48. Indeed, the firefighters had left, the equipment was gone, and the scene had been taped off.

¶52    The present case is entirely distinguishable from *Bassett*, but is analogous to *Tyler*. In *Tyler*, a fire broke out in a furniture store shortly before midnight, and upon entering the store firefighters found two plastic containers of flammable liquid. After concluding that the fire could have been caused by arson, the firefighters summoned a police detective, who arrived around 3:30 a.m. *Tyler*, 436 U.S. at 502, 98 S. Ct. at 1946. The detective "took several pictures of the containers and of the interior of the store, but finally abandoned his efforts because of the smoke and steam." *Tyler*, 436 U.S. at 502, 98 S. Ct. at 1946. The firefighters thereafter removed and preserved the two containers of flammable liquid. At 9:00 a.m. the following morning, the detective returned to the store with another detective and "searched through the rubble 'looking for any other signs

24

or evidence that showed how this fire was caused,'" in the process seizing several pieces of carpet and stairs as "evidence suggestive of a fuse trail." *Tyler*, 436 U.S. at 502, 98 S. Ct. at 1946.

¶53 In upholding the firefighters' and detectives' search and seizure of evidence, the United States Supreme Court rejected the notion that "the exigency justifying a warrantless entry to fight a fire ends, and the need to get a warrant begins, with the dousing of the last flame." *Tyler*, 436 U.S. at 510, 98 S. Ct. at 1950. The Supreme Court characterized this view of the firefighting function as "unrealistically narrow," and held that "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." 436 U.S. at 510, 98 S. Ct. at 1950. Implicit in this holding, based on the facts of that case, is the rule that such an investigation does not require officers to stay physically present inside the structure throughout the time they are investigating, or that law enforcement must be actively participating in suppression efforts, as this Court would require. Indeed, the detective in *Tyler* left the premises for five hours, and even upon returning, left the structure again to obtain tools. The United States Supreme Court nonetheless held that "the morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence." *Tyler*, 436 U.S. at 511, 98 S. Ct. at 1951.

¶54 The present case is distinguishable from *Bassett* because, in contrast to the defendant in that case, here McCord was not entering the structure on a fishing expedition for evidence of unrelated criminal activity. In *Bassett*, the deputy sheriff was

25

looking for evidence of drug possession. Here, McCord was looking for evidence of arson—the crime resulting in McCord's presence at the structure in the first place. Indeed, McCord's original entry was in fact in a firefighting capacity, and his third and subsequent visits were to further investigate the cause of the fire, intending to prevent the destruction of evidence. Had McCord simply stayed in the smoky structure the entire time, it seems apparent that this Court would have no issue with his actions. Nonetheless, because he entered and exited the building over the course of a few hours, this Court excludes all evidence discovered after his second entry into the home.

¶55 McCord never left the premises, as the detective did in *Tyler*, but instead conducted an efficient investigation for evidence that could easily be moved, thereby completing his survey of the house less than an hour and a half after the structure had been ventilated by the Lewistown Fire Department, and less than three hours after he first arrived. The evidence seized by McCord was not only in danger of destruction from firefighting efforts, but was small, mobile and could have easily been disrupted or removed by such firefighters. *See Bassett*, ¶ 47 ("In determining whether exigent circumstances exist, the court considers factors such as the possible destruction of evidence, the mobility of the evidence . . . .").

¶56 The result the Court reaches today creates an unrealistic, unworkable standard by drawing an ambiguous line as to when law enforcement's preliminary investigation at the scene of a possible arson must cease. According to the Court, McCord's subsequent entries into the structure became "clearly detached" from his initial entry—thus necessitating a warrant—as soon as McCord determined that Lewis's residence was a

26

"crime scene." This is an unworkable and ambiguous standard, and directly contradicts the United States Supreme Court's holding in *Tyler*, where that detective's presence only came about after firefighters notified police that the fire was a possible arson. To require law enforcement to abandon a structure as soon as it is determined that the area is a "crime scene" requires law enforcement to draw a line in their investigation that has not been, and cannot be, easily characterized or identified.

¶57 The "totality of the circumstances" dictated that McCord finish his ongoing, continuous investigation to prevent further evidence from being destroyed or displaced by firefighters. As the United States Supreme Court stated in *Tyler*, the exigency justifying McCord's presence did not end "with the dousing of the last flame." To require McCord to pack up and head back to town when he determined he was at a "crime scene," and when he was no longer helping with fire suppression efforts, simply does not comport with common sense, the realities of a rural arson investigation or the requirements of the constitution. I would hold that all of the evidence discovered during McCord's brief arson investigation was admissible and improperly excluded by the District Court.

¶58 The Court's response to this dissent perfectly illustrates the lack of common sense in its decision. In the Court's view, this case turns on the fact that McCord had walked outside to deposit evidence in his car and that the fire crew arrived at this remote fire location *seventeen minutes later*, after which McCord reentered the premises. To the Court, these facts demonstrate that there was no exigency and that McCord was then required to retreat and apply for a search warrant. The Court can cite no case—no case,

27

state or federal—which has ever required a warrant under such circumstances, or any authority for such a rigid view of exigency. Indeed, all of the cited authority stands precisely for the contrary. There is no authority for the Court's conclusion because it cannot withstand a simple, logical query: was it possible that further evidence was in the house which could have been lost during firefighting efforts? Of course it was possible. Although the Court asserts that, by that time, the source of the fire had already been determined and there was no further evidence to be recovered, the Court is blinded by the sharp effects of 20/20 hindsight. For all McCord knew, there may well have been additional evidence, and it may just as well have been destroyed during firefighting efforts—efforts which would have been ongoing while McCord rushed back to town to apply for a warrant. McCord was doing his job well, and the Court's decision, hinging as it does on the "seventeen minute gap" in the course of McCord's investigation, lacks connection to the reality of the circumstances or the requirements of the law.

/S/ JIM RICE