DA 06-0441

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 365

STATE OF MONTANA,

  Plaintiff and Appellee,

 v.

WAYNE ALLEN HIXON,

  Defendant and Appellant.

APPEAL FROM:   District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DC 2005-029
Honorable Michael C. Prezeau, Presiding Judge

COUNSEL OF RECORD:

  For Appellant:

    Jim Wheelis, Chief Appellate Defender, Lisa S. Korchinski, Assistant
Appellate Defender, Helena, Montana

  For Appellee:

    Hon. Mike McGrath, Montana Attorney General, Ilka Becker, Assistant
Attorney General, Helena, Montana

    Bernie Cassidy, Lincoln County Attorney, Robert Slomski, Deputy
County Attorney, Libby, Montana

         Submitted on Briefs: October 3, 2007

             Decided: November 3, 2008

Filed:

    _____
          Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Wayne Allen Hixon (Hixon) was charged with deliberate homicide and tampering with evidence on May 13, 2005 in the Nineteenth Judicial District, Lincoln County. Hixon moved to suppress evidence obtained from his vehicle on the grounds that the seizure of his truck was illegal. After a hearing on the matter, the District Court denied the motion to suppress. The first trial ended in a mistrial. The second trial resulted in the jury finding Hixon guilty and he was sentenced. Hixon appeals. We affirm.

¶2 Hixon raises the following issues on appeal:

¶3 Issue 1: Did the District Court err when it denied Hixon's motion to suppress all the evidence obtained subsequent to the warrantless seizure of the vehicle?

¶4 Issue 2: Did the District Court err when it denied Hixon's motion for mistrial due to the court's criticism in the jury's presence during defense counsel's cross-examination?

## PROCEDURAL AND FACTUAL BACKGROUND

¶5 On April 30, 2005, Eureka Police Officer Ian Jeffcock (Jeffcock) heard dispatch request fellow officer County Sherriff Deputy Mark Gray (Gray) to call them. Jeffcock called Gray to see what the situation was. Gray reported he was investigating a report of gunshots near the Rooseville border crossing for the Montana-Canada border, approximately eight miles north of Eureka. Jeffcock gave Gray some information about the area, as Jeffcock was somewhat familiar with the roads. Later, as Jeffcock was monitoring traffic on Highway 93 on the south side of Eureka, he overheard a radio

2

transmission from Gray to dispatch. Gray advised he had found the dead body of a "male resident" with a gunshot wound to the head.

¶6     Almost simultaneously, Jeffcock observed a vehicle he believed to be speeding and activated his radar. He clocked the vehicle traveling 51 mph in a 35 mph zone and initiated a traffic stop. The vehicle eventually pulled over and stopped off the highway outside the fog line. Jeffcock approached the vehicle and asked the driver, Hixon, for his driver's license and proof of insurance. The window to Hixon's vehicle did not work, so he opened his door to speak with Jeffcock. At this time Jeffcock noticed Hixon was not wearing shoes and he also detected a slight odor of alcohol. Jeffcock returned to his car to verify the registration and write out a speeding citation. While writing out the ticket, Jeffcock overheard another radio transmission from Gray in which he announced there was no weapon found by the body.

¶7     Jeffcock returned to the vehicle to give Hixon his ticket with the intention of leaving to assist Gray, as they were the only law enforcement officers on duty at the time. As Hixon engaged Jeffcock in a conversation about the ticket, he noticed the odor of alcohol again and became concerned about his level of intoxication. Jeffcock asked Hixon if he had been drinking, and Hixon responded in the affirmative. Around this time Hixon also informed Jeffcock the reason his shoes were off was because his feet stank. During their conversation Jeffcock ascertained that Hixon had recently left his house which was located at 140 Border View Drive. As it turned out, this house was in the area where the dead body had been discovered. Jeffcock later testified it was around this time he began to entertain the possibility that the Hixon DUI and the incident Gray was

3

working on may have been related, but he nonetheless continued on with his standard DUI investigation.

¶8     Jeffcock proceeded to perform the standard field sobriety tests on Hixon and determined he was intoxicated. At that point he had him take a portable breath test which resulted in a blood alcohol content of .262. Jeffcock then advised Hixon he was under arrest and placed him in the back seat of his patrol car. Jeffcock asked Hixon if he would like his shoes and Hixon replied no, he did not. Jeffcock informed Hixon that he was calling a tow truck to remove the vehicle from the side of the road, per standard department policy.

¶9     Jeffcock requested Hixon's permission to search the vehicle, which was granted. During the suppression hearing Jeffcock testified he routinely does some sort of a search during his DUI investigations to help bolster his case by finding open or empty alcohol containers. As he was beginning his search, Jeffcock received a call from Gray regarding his shooting investigation. Gray mentioned there was a distinct shoe pattern in the ground around the body. During the conversation Jeffcock continued his search and found Hixon's shoes in the back seat. He did not touch the shoes. He informed Gray of his discovery and told him he had Hixon detained for DUI and also was having his truck towed because of the DUI policy. Jeffcock then went back to his vehicle to re-position the handcuffs on Hixon for his comfort, at which time he also Mirandized him because Hixon was volunteering random information.

¶10    While waiting for the tow truck to arrive, Fish and Game Officer Jim Roberts (Roberts) arrived on the scene. Roberts was on his way to help Gray and stopped by to

4

see what Jeffcock was doing. (This area of Montana has very few law enforcement officers and an unspoken agreement of helping across agency lines exists). After ascertaining who Jeffcock had pulled over, Roberts informed him that earlier that day he was called to an incident involving Hixon and his neighbor Bob Mast (Mast). Roberts left soon after to report to Gray's location and subsequently ascertained that the victim was in fact Mast.

¶11 The tow truck arrived shortly after Roberts left and Jeffcock assisted the operator in securing the vehicle. Jeffcock then followed the truck to the owner's business and waited there for another officer to arrive to preserve the chain of evidence as his suspicion of the connection had now grown. Jeffcock then transported Hixon to the police department.

¶12 On May 3, 2005, Detective Darren Short (Short) of the Lincoln County Sheriff's Department applied for a search warrant to search Hixon's vehicle which had been hauled to the Sherriff's impound lot. The search warrant application included a copy of Jeffcock's report of the events surrounding his traffic stop, which described his consent search of Hixon's truck and his observation of a pair of New Balance tennis shoes behind the passenger seat. Short also noted in his application that he personally looked through the window of the truck and saw the tennis shoes. The report also included notations from the crime scene that footprints near the body were consistent with New Balance shoes. Also contained in the application was information from Roberts about his interaction with Hixon and Mast, the victim, from earlier on the day of the shooting. Short's application for the search warrant was granted and a search ensued. As a result of

the search, Hixon's tennis shoes were seized from the vehicle, the shoeprints at the crime scene matched the shoes, and Hixon was charged with deliberate homicide.

¶13 On September 27, 2005 Hixon filed a motion to suppress the evidence obtained from the seizure and search of his truck on the grounds the seizure was illegal. Hixon does not directly challenge the search on appeal; rather, his arguments are addressed solely to the seizure of his vehicle. At the hearing on the motion to suppress, Jeffcock testified he called a tow truck for several reasons: department policy; liability reasons; no option of a sober driver to take the vehicle; position of the vehicle close to the fog line; and its location near where the speed limit turned to 70 mph. He also testified he had been in trouble before for not towing a vehicle. Jeffcock testified that at the time he called for a tow truck to move the vehicle, he had not decided the two incidents were connected. By the time the truck arrived he believed they possibly were. However, he maintained he was not towing the truck to have it secured for the county officers involved in the homicide case. The court denied the motion to suppress, concluding that the seizure of the truck was lawful and that the shoes would have been inevitably discovered in any event, pursuant to the consent search and the ensuing valid search warrant.

¶14 Nearing the end of the second day of trial at the beginning of cross-examination, Hixon asked the court for a little leeway on time with respect to the examination of Border Patrol Officer Carol Schindele. The following conversation occurred:

The Court: What do you mean leeway? I'm not going to keep the jury here any longer.

Defense Counsel: Well, I don't want the jury going home without my opportunity to cross examine her.

6

| The Court: | Well, you guys waste time. Why should this jury suffer because you guys ask the same questions eight times? I mean, it's five o'clock. It's been a long day. |
|---|---|
| The State: | Your Honor, she . . . |
| Defense Counsel: | I have no questions of the witness, Your Honor. |
| The Court: | I mean, we can bring her back tomorrow and you can cross examine her. |
| Defense Counsel: | I have no questions of the witness. |
| The Court: | That's what I'm offering. Now what about the situation you talked about last night about not releasing her? |
| Defense Counsel: | As far as I'm concerned she can be released. |
| The Court: | Thank you ma'am. You may step down. . . . Thank you. Okay. It's exactly 5:00 and we are going to break for the evening. |

¶15    After the jury was dismissed for the day Hixon moved for a mistrial. Defense counsel stated due to federal bureaucracy he was unable to interview the witness prior to the trial and complained he was scolded in front of the jury. He felt the court made him look as if he was wasting the jury's time before he even had the chance to question the witness. In regards to the issue of interviewing the witness, the court explained he should not have waited until mid-trial to bring up the issue. The court then explained its reasons for the comments, blaming the slow pace of the trial on the State. The trial judged noted "I specifically did not direct my unhappiness at (the prosecutor), but I think it's pretty clear that he's the one who is asking every question three, or four, or five times." The court further indicated it did not mean to cast aspersions on the defense and he was

7

worried about keeping the jury late. The court was concerned when the prosecution called a new witness so close to five o'clock and reprimanded the State for its slow pace. The court then denied the motion.

¶16 The next day in the presence of the jury the court stated:

> Yesterday I ended the day blowing up a little bit and I felt bad about that all night. I am kind of protective of the jury because I feel like when you have jury selection, and the lawyers always ask how many people have been on a jury, and a few people raise their hand. Most people say I enjoyed the experience. And I want you to all go away from this trial, or any trial, I don't know if enjoyment is the word, but finding that it was a satisfying experience, and feeling like you were appreciated while you were here. I know that you don't get paid anything and you have to kind of put your work and your families aside for these days. And I just don't like to send you out the door at 6:00 and expect you to get home at 7:30, and that sort of thing. So I try to start on time, take breaks, finish on time. And I get frustrated some times when I feel like we are moving a little slowly. But it seems like sometimes I don't always get mad at the right people, or I don't get mad at the right time, or I don't bite my tongue when I should. I do feel bad about that.

¶17 The trial continued and Hixon was found guilty of the charges against him. This timely appeal follows.

## STANDARDS OF REVIEW

¶18 We review a district court's decision to grant or deny a motion to suppress to determine whether the court's underlying findings of fact are clearly erroneous and whether the court correctly interpreted and applied the law to those findings. *State v. Lewis*, 2007 MT 295, ¶ 17, 340 Mont. 10, ¶ 17, 171 P.3d 731, ¶ 17. A trial court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been made. *Lewis*, ¶ 17.

8

¶19 This Court reviews a district court's ruling on a motion for mistrial for an abuse of discretion. When a defendant moves for a mistrial, the court bases its decision on whether the defendant has received a fair and impartial trial. *State v. Partin*, 287 Mont. 12, 15-18, 951 P.2d 1002, 1004-05 (1997).

## DISCUSSION

¶20 **Issue 1: Did the District Court err when it denied Hixon's motion to suppress all the evidence obtained subsequent to the warrantless seizure of the vehicle?**

¶21 Hixon maintains on appeal that the evidence obtained as a result of the seizure of his pickup truck—including the tennis shoes that were matched to the scene of the crime—should have been suppressed in light of the illegal seizure of his truck. In response, the State maintains that the truck was lawfully seized pursuant to Eureka Police Department policy, and that, in any event, the shoes were discovered following a consent search of the vehicle and the ensuing issuance of a valid search warrant.

¶22 At the time the vehicle was seized, it was the policy of the Eureka Police Department to tow vehicles from the scene of a DUI in the event there was no sober driver available to drive the vehicle away. This policy had been implemented to avoid the potential liability to the City which might arise if the vehicle left at the roadside was damaged by other persons, or created a traffic hazard resulting in an accident. Hixon's vehicle was stopped near the fog line on the roadway in an area where the speed limit changed from 45 mph to 70 mph. Jeffcock claims he was merely following the normal DUI procedure in seizing the vehicle. In fact, he testified he had been previously reprimanded for failing to tow a vehicle under similar circumstances.

¶23 Hixon argues that the seizure of his truck was unlawful, because it was not based upon probable cause. He maintains that the timing of the seizure suggests that the truck was seized not based upon policy, but rather based upon suspicion that Hixon was connected to the murder then being investigated. However, Hixon offers no more than speculation for this theory. Moreover, it is unnecessary for us to resolve this question because it is undisputed that before the tow truck arrived, Hixon consented to Jeffcock's request to take a look inside his vehicle, that Jeffcock then observed the shoes, and that the officers subsequently obtained a search warrant for the vehicle—the validity of which is not in dispute—before seizing the tennis shoes. Accordingly, it is reasonable to assume, as did the District Court, that the shoes would have been inevitably discovered in any event, notwithstanding the alleged constitutional violations. *See State v. Allies*, 186 Mont. 99, 118, 606 P.2d 1043, 1053 (1979), *overruled on other grounds*, *State v. Bower*, 254 Mont. 1, 7, 833 P.2d 1106, 1110 (1992).

¶24 Based upon the foregoing, we conclude the District Court did not err in denying Hixon's motion to suppress all evidence obtained subsequent to the warrantless seizure of his truck.

¶25 **Issue 2: Did the District Court err when it denied Hixon's motion for mistrial due to the court's criticism in the jury's presence during defense counsel's cross-examination?**

¶26 The right to a fair trial is guaranteed by the Sixth Amendment to the U.S. Constitution and in the Montana Constitution at Article II, Section 24. Hixon asserts that the judge's comments on "wasting time" deprived him of his right to a fair trial. Hixon

contends the judge's assertion that his statements were directed toward the State and his general apology the next day did not rectify the wrong done.

¶27 Hixon cites numerous cases in support of his argument; however these cases address a judge's comments on the evidence. *Foley v. Harrison Ave. Motor Co.,* 267 Mont. 200, 203-04, 883 P.2d 100, 102 (1994); *State v. Dickens*, 198 Mont. 482, 486, 647 P.2d 338, 341 (1982); *State v. Cassill*, 70 Mont. 433, 452, 227 P.49, 57 (1924); *State v. Fuller*, 34 Mont. 12, 26, 85 P.369, 374 (1906). These cases are not analogous, as the Court here made no comment on the evidence. Another case Hixon cites addresses improper statements given by witnesses; this too is not analogous. *Partin*, 287 Mont. at 18, 951 P.2d at 1005. At issue here is a statement made by the judge about the pace of the trial, not about the evidence or any testimony given at trial.

¶28 Section 46-20-701(1), MCA, provides:

> Whenever the record on appeal contains any order, ruling, or proceeding of the trial court against the convicted person affecting the convicted person's substantial rights on the appeal of the cause, together with any required objection of the convicted person, the supreme court on that appeal shall consider the orders, rulings, or proceedings and the objections thereto and shall reverse or affirm the cause on the appeal according to the substantial rights of the respective parties, as shown upon the record. A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial.

¶29 In reviewing the record it is clear the substantial rights of Hixon were not violated. Outside the presence of the jury the judged explained to counsel that his comments were directed towards the prosecution, given that the State had moved at an extremely slow pace. The next day the judge apologized to the jury for his comments and instructed the jury that no comment he made was intended in any way to express his opinion about the

11

facts of the case or the verdict they should reach. We have held "where the trial judge strikes improper statements from the record with an accompanying cautionary instruction to the jury, any error committed by its introduction is presumed cured." *State v. Dubois*, 2006 MT 89, ¶ 60, 332 Mont. 44, ¶ 60, 134 P.3d 82, ¶ 60. We conclude that under these circumstances, there has been no showing that Hixon was prejudiced by the court's remarks.

¶30 As the authority offered by Hixon is not analogous or persuasive and his right to a fair trial was not impeded by the comment made by the court, we conclude the District Court did not abuse its discretion in denying the motion for mistrial.

¶31 Affirmed.

/S/ PATRICIA COTTER

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ JAMES C. NELSON
/S/ JIM RICE