
DA 08-0149

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2009 MT 192

STATE OF MONTANA,

      Plaintiff and Appellant,

  v.

WILLIAM BRUCE ELLIS, JR.,

      Defendant and Appellee.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Silver Bow, Cause No. DC 2007-121
Honorable Brad Newman, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Steve Bullock, Montana Attorney General, Tammy K. Plubell, Assistant
Attorney General, Helena, Montana

            Robert M. McCarthy, Silver Bow County Attorney, Samm Cox (argued),
Deputy County Attorney, Butte, Montana

      For Appellee:

            Gregory Jackson, Jackson Law Firm, P.C., Helena, Montana

            Chad Wright (argued), Hooks & Wright, P.C., Helena, Montana

                     Argued: March 11, 2009
               Submitted: March 12, 2009
                Decided: June 5, 2009

Filed:

_____
                   Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     The State appeals an order of the District Court for the Second Judicial District, Silver Bow County, granting Dr. William Ellis's motion to suppress all of the evidence obtained from a search of his residence after the police received a report of sexual assault upon his thirteen-year-old daughter. We affirm in part, reverse in part and remand for further proceedings consistent with this Opinion.

¶2     We address the following issue on appeal: Whether the District Court erred in granting Ellis's Motion to Suppress Evidence.

**Factual and Procedural Background**

¶3     Just before 1:00 p.m. on October 5, 2006, Officer Dan Murphy, a patrol officer with the Butte-Silver Bow Police Department, was dispatched to a Butte residence to respond to a report of sexual assault on a young woman. He was not informed at that time that the victim was a juvenile. Officer Murphy was dressed in his police uniform and he arrived in his patrol car which he parked in front of the residence. When he arrived at the residence, the victim, S.S., met him at the door. She was crying and her "eyes were very red and puffy." Officer Murphy later testified that S.S. was obviously a teenager, but he could not tell whether she was over or under sixteen years of age. In fact, she was only thirteen years old.

¶4     S.S. invited Officer Murphy into the living room of the residence and they sat down on the couch. Officer Murphy testified that although S.S. initially was so upset she was unable to speak, she eventually told Officer Murphy that her father, Dr. William Ellis, had touched her inappropriately the previous evening. According to the

2

Application for Leave to File Information, S.S. told Officer Murphy that she had been sick during the week leading up to the incident and that two nights before this, Ellis had given her some medication that made her feel "goofy." S.S. said that before she went to bed on the night of the alleged assault, Ellis had given her some different medication, which she described as blue and pink pills.

¶5 S.S. told Officer Murphy that she was in her bedroom sleeping when Ellis came into her room. Although she was very sleepy, S.S. felt Ellis pull her v-neck night shirt down to expose her breasts, and pull her pajama shorts and underwear down to her thighs. While S.S. pretended to remain asleep, she opened her eyes slightly to confirm that it was Ellis. She saw that he was wearing a t-shirt, but he was nude from the waist down. S.S. stated that Ellis masturbated while he fondled her breasts and vagina. When Ellis was finished, he pulled her night shirt back into place, pulled up her underwear and pajama shorts, covered her back up, and left the room. S.S. was uncertain whether Ellis ejaculated.

¶6 S.S. also told Officer Murphy that when Ellis woke S.S. up for school that morning, she told him that she was not feeling well and intended to stay home. After Ellis left the house, S.S. tried to call her grandmother and a family friend without success. She was initially reluctant to call the police, but eventually decided to do so.

¶7 Officer Murphy testified that when he realized he was dealing with a child sexual abuse crime, he, pursuant to protocol, asked that a detective be dispatched to the scene to follow through with the investigation. While waiting for the detective, Officer Murphy asked S.S. to show him where the alleged assault had taken place. S.S. took Officer

3

Murphy upstairs to her bedroom, which Officer Murphy later described as "a typical girl's bedroom."

¶8     Officer Murphy asked S.S. what she had been wearing and S.S. retrieved her pajamas from the side of her bed. She said she was still wearing the same pair of underwear that she had been wearing during the alleged assault. S.S. tried to describe to Officer Murphy the medication that Ellis had given her. In doing so, she proceeded to a closet around the corner from her bedroom that contained various types of medication. S.S. looked through the medication, but was unable to identify exactly what she had been given. Officer Murphy testified that he did not look through the closet since he didn't know what type of pills to look for.

¶9     Officer Murphy and S.S. returned downstairs when Detective George Holland arrived. Detective Holland later testified that he recognized that S.S. was a juvenile and guessed that she was about the same age as his own fourteen-year-old daughter. Officer Murphy briefed Detective Holland and took him upstairs to S.S.'s bedroom while S.S. remained downstairs. Officer Murphy showed Detective Holland the bedroom, the bedding, and the pajamas that S.S. had shown him.

¶10    The officers returned to the living room when they heard a male voice downstairs. They found Ellis sitting next to S.S. on the couch. S.S. was visibly upset and crying. Detective Holland identified Ellis as S.S.'s father and asked that Ellis go outside with Officer Murphy. Ellis complied. Neither Detective Holland nor Officer Murphy asked Ellis for permission to search the home, and Ellis did not order the officers out of the home or voice any objections to the officers being present in the home.

4

¶11    Once outside, Ellis asked Officer Murphy what was going on. Officer Murphy told Ellis that he was not at liberty to say, but that he would transport Ellis to the police station where Detective Holland would speak with him and fill him in. Officer Murphy could not remember whether or not he handcuffed Ellis before placing him in the patrol car, but he testified that it is the general practice to do so. Detective Holland testified at the suppression hearing that, after Ellis left, S.S. told Detective Holland that Ellis had asked her what was wrong and she told Ellis that she did not want to talk to him.

¶12    Detective Holland took photographs of S.S.'s bedroom and began collecting evidence. While he was doing so, his Captain, Doug Conway, arrived to see if Detective Holland needed any assistance. Detective Holland and Captain Conway took possession of the sheets, comforter and blanket on S.S.'s bed, as well as her pajamas. They also had S.S. change clothes so that they could take possession of the underwear that she was wearing at the time of the alleged assault.

¶13    Because the Child Evaluation Center at the hospital was being renovated, Detective Holland took S.S. to the police station to speak with a trained forensic interviewer. While at the station, Detective Holland provided S.S with a receipt for the items he seized from the home. Detective Holland also filled out a Permission to Search Form and had S.S. sign it.

¶14    After reviewing the forensic expert's interview with S.S., Detective Holland conducted a taped interview with Ellis. In the interview, Ellis admitted that around 10:00 p.m. the previous evening he had given S.S. a 12.5 milligram dose of Ambien CR to help her sleep. However, a drug screening performed about sixteen hours after Ellis

5

gave S.S. the medication showed that S.S. may have ingested 50 to 60 milligrams, or four or five tablets of Ambien CR. Ellis also admitted to Detective Holland that he went into S.S.'s bedroom to check on her, but he denied any type of sexual contact.

¶15 Ellis told Detective Holland that S.S. had been disappearing after school and at night, and that he had caught her in numerous lies. He said that he grounded her for three-and-a-half weeks immediately before she called the police, and that her allegations against him fit her previous behavior. Some time later, after DNA evidence from the sheets taken off of S.S.'s bed revealed multiple semen samples containing Ellis's DNA, Ellis explained that the sheets must have been taken from the dirty clothes hamper where they could have been mixed with his own sheets that contained his semen.

¶16 On September 11, 2007, the State filed an Information charging Ellis with sexual assault, a felony, in violation of § 45-5-502(1) and (3), MCA (2005). Thereafter, Ellis filed a motion to suppress wherein he contended that since S.S. was less than sixteen years old, she lacked the capacity to consent to a search of Ellis's residence or her own bedroom.[1] Thus, Ellis argued that the seizure of S.S.'s bedding, pajamas and underwear violated both the United States and Montana Constitutions because it was done without his consent or a search warrant. In its brief opposing Ellis's motion to suppress, the State argued that in a case such as this where the child granting them entrance to the home may be the victim of a sexual assault, a warrant was not necessary.

---

[1] Ellis also moved to suppress any statements he made while in custody contending that they were not made knowingly and voluntarily. The District Court denied his motion to suppress the statements; however, Ellis is not now challenging the court's ruling on that issue.

6

¶17 A hearing on Ellis's motion was held on February 14, 2008. The State called two witnesses, Officer Murphy and Detective Holland. Ellis did not call any witnesses. At the conclusion of the hearing, the State conceded that no exigent circumstances existed in this case and that any evidence seized from searches outside S.S.'s bedroom should be suppressed. The State maintained, however, that S.S. had a constitutional right to the sanctity of her own room, and that this Court's decision in *State v. Schwarz*, 2006 MT 120, 332 Mont. 243, 136 P.3d 989, wherein we held that a minor lacks the capacity or the authority to consent to a search, did not apply.

¶18 On March 7, 2008, the District Court granted Ellis's motion to suppress all of the evidence seized from the search of his home. In reaching this decision, the court determined that *Schwarz* controlled and that, since S.S. did not have actual authority to consent to a search, the officers were obligated to obtain valid consent from Ellis or a search warrant prior to seizing items from S.S.'s bedroom. The court also noted that no evidence would have been lost or destroyed because of any delay involved in obtaining a search warrant.

¶19 The State appeals the District Court's Order granting Ellis's Motion to Suppress Evidence.

**Standard of Review**

¶20 We review a district court's decision to grant or deny a motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Lewis*, 2007 MT 295, ¶ 17, 340 Mont. 10, 171 P.3d 731 (citing *State v. DeWitt*, 2004 MT 317, ¶ 21,

324 Mont. 39, 101 P.3d 277). A trial court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been made. *Lewis*, ¶ 17 (citing *State v. Lanegan*, 2004 MT 134, ¶ 10, 321 Mont. 349, 91 P.3d 578).

**Discussion**

¶21 *Whether the District Court erred in granting Ellis's Motion to Suppress Evidence.*

¶22 The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." While the Montana Constitution's provision regarding searches and seizures mirrors the Fourth Amendment, *see* Mont. Const. art. II, § 11, the Montana Constitution also affords its citizens additional privacy protections: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest," Mont. Const. art. II, § 10. Thus, Montanans enjoy a greater right to privacy exceeding even that provided by the federal constitution. *State v. Burns*, 253 Mont. 37, 40, 830 P.2d 1318, 1320 (1992).

¶23 In determining whether a state action constitutes an unreasonable or unlawful search or seizure in violation of the Montana Constitution, we look to three factors: "(1) whether the person challenging the state's action has an actual subjective expectation of privacy; (2) whether society is willing to recognize that subjective expectation as objectively reasonable; and (3) the nature of the state's intrusion." *State v. Goetz,* 2008

8

MT 296, ¶ 27, 345 Mont. 421, 191 P.3d 489 (citing *State v. Hill*, 2004 MT 184, ¶ 24, 322

Mont. 165, 94 P.3d 752). We stated in *Goetz* that

> [t]he first two factors are considered in determining whether a search or
> seizure occurred, thus triggering the protections of Article II, Sections 10
> and 11. The third factor relates to the reasonableness of the search or
> seizure under the circumstances. Under the third factor, we determine
> whether the state action complained of violated the Article II, Section 10
> and 11 protections because it was not justified by a compelling state interest
> or was undertaken without procedural safeguards such as a properly issued
> search warrant or other special circumstances.

*Goetz*, ¶ 27 (citing *State v. Tackitt*, 2003 MT 81, ¶ 23, 315 Mont. 59, 67 P.3d 295; *State

v. Scheetz*, 286 Mont. 41, 50, 950 P.2d 722, 727 (1997); *State v. Smith*, 2004 MT 234,

¶¶ 12-13, 322 Mont. 466, 97 P.3d 567).

¶24    We have repeatedly held that " 'warrantless searches conducted inside a home are

*per se* unreasonable, subject only to a few specifically established and well-delineated

exceptions.' " *State v. McLees*, 2000 MT 6, ¶ 10, 298 Mont. 15, 994 P.2d 683 (quoting

*State v. Hubbel*, 286 Mont. 200, 212, 951 P.2d 971, 978 (1997) (internal citations

omitted)); *see also Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967).

" 'One such exception is when the search is conducted pursuant to a consent that is freely

and voluntarily given.' " *McLees*, ¶ 10 (quoting *Hubbel*, 286 Mont. at 212, 951 P.2d at

978); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045

(1973). Moreover,

> "when the prosecution seeks to justify a warrantless search by proof of
> voluntary consent, it is not limited to proof that consent was given by the
> defendant, but may show that permission to search was obtained from a
> third party who possessed common authority over or other sufficient
> relationship to the premises or effects sought to be inspected."

*Schwarz*, ¶ 9 (emphasis omitted) (quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974)).

¶25 On appeal, the State argues that this Court's decision in *Schwarz*—holding that a youth under the age of sixteen lacks the capacity or the authority to consent to a search of her parents' home, *Schwarz*, ¶ 14—is not applicable here because S.S. was the victim of a crime, and as such, she had actual authority to allow law enforcement officers into the home and to take them to her bedroom to show them where the crime occurred. The State also argues that, even if we conclude that *Schwarz* is applicable, the evidence obtained in this case is still admissible under the inevitable discovery doctrine.

¶26 In *Schwarz*, law enforcement officers were trying to locate and arrest Jonathan Lowe. After the officers learned that Lowe was staying at the home of his girlfriend, Kerry Ann Schwarz, three officers drove to Schwarz's residence to make an arrest. Schwarz was out bowling for the evening, but Schwarz's thirteen-year-old daughter was at the residence along with two friends. When Schwarz's daughter answered the door, the officers explained to her that they were looking for Lowe. Whether the girl invited the officers to search the home, or whether the officers directly asked permission to enter is not clear, nevertheless, the officers entered the residence with her consent. None of the officers attempted to contact Schwarz, nor did they obtain a search warrant before entering the residence. *Schwarz*, ¶ 3.

¶27 During the search of the residence, the officers discovered a marijuana pipe and a small plastic container containing a white substance later determined to be methamphetamine. At some point during the search, Schwarz called home to check on

10

her daughter and learned that the officers were there searching the residence. Schwarz immediately drove home. Upon her arrival, one of the officers told Schwarz that they had discovered drugs and drug paraphernalia. Schwarz admitted to owning the items and provided the officers with written consent for another search of her home. Schwarz was arrested and taken to the police station where she was charged with criminal possession of dangerous drugs, a felony. *Schwarz*, ¶¶ 1, 4.

¶28 Schwarz filed a motion to suppress the evidence seized from her home arguing that the officers illegally searched her home in violation of Article II, Sections 10 and 11 of the Montana Constitution. After a hearing on the motion, the District Court determined that because Schwarz's daughter and her friends were home alone on a Friday night, "all the parents had confidence in these girls to exercise good judgment." *Schwarz*, ¶ 5. Consequently, because the officers had every reason to believe that Schwarz's daughter had authority to let the officers into the house to look for Lowe, the court determined that the motion to suppress should be denied. *Schwarz*, ¶ 5.

¶29 In reversing the District Court's decision in *Schwarz*, we reviewed our caselaw regarding third-party consent to search and we reiterated that "for third-party consent to be valid as against the defendant, the consenting party must have actual authority to do so." *Schwarz*, ¶ 10 (emphasis omitted) (quoting *McLees*, ¶ 32 (rejecting the doctrine of apparent authority addressed in the United States Supreme Court's decision in *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S. Ct. 2793, 2800 (1990))).

¶30 We determined in *Schwarz* that, in general, a youth does not have authority equal to that of a parent or guardian regarding their shared property.

11

"A minor child who lives in the same home with his or her parents or guardians obviously shares use of the property with the parent or guardians to some extent. However, it should also be obvious that a child generally does not share mutual use of the property with a parent to the same extent that such use might be shared between spouses or between cohabiting adults."

*Schwarz*, ¶ 13 (quoting *State v. Tomlinson*, 648 N.W.2d 367, 376 (Wis. 2002)). We also stated in *Schwarz* that

even if a parent chooses to grant her minor children joint access and mutual use of the home, "parents normally retain control of the home, as well as the power to rescind the authority they have given." . . . [A] parent has not surrendered the privacy of his home to the discretion of a child, but rather, the child has privacy at the discretion of the parent. In other words, *"a child cannot waive the privacy rights of her parents."*

*Schwarz*, ¶ 13 (quoting *People v. Jacobs*, 729 P.2d 757, 763 (Cal. 1987)) (emphasis added).

¶31   On that basis, we concluded in *Schwarz* that in light of Montana's enhanced right to privacy under Article II, Section 10 of the Montana Constitution, "consent, as an exception to the warrant requirement, must be narrowly construed." *Schwarz*, ¶ 14. Therefore, we adopted "a *per se* rule that a youth under the age of sixteen lacks the capacity or the authority to consent to a search of her parents' home." *Schwarz*, ¶ 14.

¶32   We found further persuasive authority for our holding in *Schwarz* in § 41-5-331(2), MCA, which provides that a youth under the age of sixteen can only waive her right against self-incrimination with parental permission or with the advice of counsel. We observed in *Schwarz* that

[a]lthough § 41-5-331, MCA, only addresses a youth's constitutional right against self-incrimination, it nonetheless supports the principle that a minor

12

> who cannot waive her own rights without parental permission or legal counsel, cannot waive her parent's privacy rights.

*Schwarz*, ¶ 14 (citing *State v. Allen*, 188 Mont. 135, 612 P.2d 199 (1980) (holding that pursuant to § 41-5-303, MCA (the predecessor to § 41-5-331, MCA), a sixteen-year-old youth could not, without the agreement of her parents or advice of counsel, consent to a search of her own apartment)).

¶33   The State argues that *Schwarz* is factually distinguishable from the instant case and, therefore, inapplicable, because the officers were lawfully at Ellis's home because of the alleged sexual assault upon S.S.  The State maintains that *Schwarz* was not designed to protect a parent who commits a crime against a child in the child's own bedroom by prohibiting the child from assisting in the investigation of the crime.  To that end, the State argues that a teenager should have at least common authority, in conjunction with her parent, over her bedroom and the personal contents therein and, therefore, actual authority to take police to her bedroom and turn over items personal to her to assist the police in investigating the crime.

¶34   The State ignores the fact that the underlying principle of *Schwarz* establishes that while a parent may grant a minor child joint access or use of the family home, the parent retains control of the home and the right to rescind the authority given to the child. Furthermore, a parent does not surrender the privacy of his home to the discretion of the child, but rather, "the child has privacy at the discretion of the parent." *Schwarz*, ¶ 13.

¶35   That said, we also emphasize that under Article II, Section 15 of the Montana Constitution, persons under eighteen years of age enjoy the same fundamental rights—

including the right of privacy—that are guaranteed to adults. In this case and in *Schwarz*-type cases, however, the focus is on the violation of the privacy rights of the parent in the control of his or her home. The focus is not on the general privacy rights of the child—except where, as with the underwear that S.S. was wearing during the alleged assault—society would recognize as reasonable a person's privacy interest in the intimate apparel that she or he was wearing at the time. Consequently, in this case, S.S. was not asserting her own constitutional rights; rather, she was attempting to waive her father's constitutional right to privacy.

¶36   Thus, in creating a *per se* rule that children under sixteen lack the authority to consent to warrantless searches, our decision in *Schwarz* did not carve out an exception for child victims. As the District Court aptly pointed out in its Memorandum and Order:

> Officers had authority to respond to the residence and meet with the victim in order to check on her welfare. The officers' presence in the residence for that purpose may have allowed for a warrantless seizure of evidence in "plain view" of the officers in the main entry or living area of the residence. That is not the situation complained of in this case. The 13-year-old victim lacked the capacity or authority to consent to a search of [Ellis's] residence, particularly to a search of second floor areas of the house that cannot be seen from the main living area.

¶37   Contrary to the State's assertions, the rule announced in *Schwarz* does not prevent law enforcement officers from responding to the calls of potential child victims. As Ellis points out in his brief on appeal, Officer Murphy certainly had a duty to respond to the dispatch to Ellis's residence to meet with S.S. However, that duty only applied to making sure that S.S. was safe and that any potential evidence would not be destroyed. Indeed, in *Georgia v. Randolph*, 547 U.S. 103, 118-19, 126 S. Ct. 1515, 1525-26 (2006), the United

14

States Supreme Court acknowledged that requiring a warrant when consent to search is disputed does not prevent law enforcement officers from protecting victims of domestic violence.

¶38 When Officer Murphy realized that he was dealing with a potential child sexual abuse crime, he asked that a detective be dispatched to the scene to follow through with the investigation. Officer Murphy could easily have requested that officers obtain a search warrant and meet him at the residence. The State conceded that there were no exigent circumstances in this case. Although visibly upset, S.S. was not in any imminent danger, and Ellis was immediately taken into custody and transported to the police station where he was held for several hours. The officers could have secured the home to prevent the destruction of any evidence until a search warrant arrived.

¶39 In addition, it was the middle of a weekday afternoon and there should have been any number of neutral and detached magistrates available to review an application for a search warrant. We indicated in *McLees* the rationale behind the warrant requirement:

> The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment [and Article II, Section 11 of the Montana Constitution] [have] interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.

*McLees*, ¶ 26 (quoting *State v. Sorenson*, 180 Mont. 269, 274-75, 590 P.2d 136, 140 (1979), *overruled in part by State v. Loh*, 275 Mont. 460, 914 P.2d 592 (1996)).

¶40    Here, the State ignores the multidimensional analysis in *Schwarz* and assumes that we did not consider in that case the possibility of a child calling the police to report a crime. On the contrary, one of the first cases we cited in *Schwarz* considered the possibility that a child may consent to a search of the home after reporting that they were the victim of or a witness to a crime. *Schwarz*, ¶ 11 (citing *Abdella v. O'Toole*, 343 F.Supp.2d 129, 135 (D.Conn. 2004)). In *Abdella*, the federal district court cited in turn to two cases from lower courts that found that children had authority to consent to home searches after alleging that they were the subject of sexual abuse crimes. *Abdella*, 343 F.Supp.2d at 135 n. 1 (citing *Murphy v. State*, 355 So. 2d 1153 (Ala. Crim. App. 1978) (twelve-year-old sexual abuse victim consented to search of residence); *State v. Folkens*, 281 N.W.2d 1 (Iowa 1979) (fourteen-year-old sexual abuse victim consented to search of residence)).

¶41    We also discussed in *Schwarz* a case wherein a child was the witness to a crime. In *Davis v. State*, 422 S.E.2d 546 (Ga. 1992), the ten-year-old stepson of the defendant called the police to report the presence of illegal drugs in the home. When the officers arrived, the child met them outside and then showed them into the home to the locations where the child knew his mother and stepfather kept their illegal drugs. The court in *Davis* recognized that while it was appropriate for the child to call police for assistance and for the police to respond, once the officers realized that no present danger existed, they should not have entered the home based solely on the consent of the child. *Davis*, 422 S.E.2d at 550.

¶42     In the case *sub judice,* the State argued that the officers had every right to seize items in plain view.  However, the items seized in this case were not in plain view.  They were located in an upstairs bedroom out of Officer Murphy's view while he was speaking with S.S. in the living room of the residence.

¶43     The plain view doctrine " 'allows peace officers, under certain circumstances, to seize evidence in plain view without a warrant.' "  *Lewis,* ¶ 22, (quoting *Loh,* 275 Mont. at 468, 914 P.2d at 597).  We stated in *Lewis,* that

> [i]f, while a law enforcement officer is lawfully present on an individual's property, and in the course of his or her lawful presence, the officer discovers evidence in plain view, and if its incriminating nature is "immediately apparent," then that evidence may be seized and used against the defendant at trial.

*Lewis,* ¶ 22 (citing *DeWitt,* ¶ 25; *State v. Bassett,* 1999 MT 109, ¶ 52, 294 Mont. 327, 982 P.2d 410; *State v. Weaselboy,* 1999 MT 274, ¶ 23, 296 Mont. 503, 989 P.2d 836; *Loh,* 275 Mont. at 473, 914 P.2d at 600).  However, we explained in *Lewis* that " 'plain view' does not permit the officer to proceed or intrude without a warrant to the location of the evidence in question.  To the contrary, the doctrine's applicability *depends* on the officer's lawful presence and right of access to the evidence."  *Lewis,* ¶ 24 (emphasis in original).

¶44     In this case, the evidence seized—the bedding and clothing—was taken from S.S.'s bedroom.  Setting aside for the moment the issue of whether the officers were lawfully present in the living room of the residence while they spoke with S.S., the bedding and clothing were not within the officer's plain view from that vantage point.

Instead, the officers had to walk through the house and up the stairs to get to S.S.'s bedroom. Consequently, the plain view doctrine is not applicable in this case.

¶45 Additionally, after returning to the stationhouse, Detective Holland filled out a Permission to Search Form and had S.S. sign it. However, even if S.S. had the capacity and authority to consent to a search of the residence, which we have already determined she did not, this after-the-fact written consent was ineffective. We determined in *Hubbel*, that "to be valid and qualify as an exception to the warrant requirement, a consent must *precede* a search." *Hubbel*, 286 Mont. at 216, 951 P.2d at 980 (emphasis added). Along those same lines, the United States Supreme Court concluded that "to be lawful, a search and seizure must be justified *from the beginning*." *Hubbel*, 286 Mont. at 216, 951 P.2d at 981 (emphasis added) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968)). The reasoning behind this is that "[a] search validated by a 'retroactive consent' is not really a search conducted pursuant to a consent at all. Rather, at the moment of inception, the search is unlawful and unjustified." *Hubbel*, 286 Mont. at 216, 951 P.2d at 980. Moreover, "[a]llowing an after-the-fact 'consent' to justify an otherwise lawless search and seizure would erode the suppression rule's deterrent force." *Hubbel*, 286 Mont. at 217, 951 P.2d at 981.

¶46 In its brief on appeal, the State raised the issue of inevitable discovery arguing that because the officers clearly had probable cause to seek a search warrant, the evidence would have been discovered eventually. Ellis argues, on the other hand, that inevitable discovery is not only factually insupportable in this case, it is procedurally inappropriate because the State did not raise this issue in the court below. The State only mentioned

18

the inevitable discovery doctrine in a heading to one section of its brief in opposition to Ellis's motion to suppress. The State did not thereafter discuss the issue or analyze how it applied in this case.

¶47 We have repeatedly held that we will not address issues raised for the first time on appeal. *State v. Ferguson*, 2005 MT 343, ¶ 38, 330 Mont. 103, 126 P.3d 463 (citing *State v. Adgerson*, 2003 MT 284, ¶ 12, 318 Mont. 22, 78 P.3d 850; *State v. Peterson*, 2002 MT 65, ¶ 24, 309 Mont. 199, 44 P.3d 499). However, we concluded in *State v. Dickinson*, 2008 MT 159, ¶ 24, 343 Mont. 301, 184 P.3d 305, that the question of whether evidence would have been inevitably discovered is one we can answer *sua sponte*, provided there is a sufficient record before us to make that determination. Consequently, we will address this issue.

¶48 The inevitable discovery doctrine is an exception to the exclusionary rule. *Dickinson*, ¶ 19. "The exclusionary rule bars evidence obtained as a result of an unconstitutional search or seizure, also known as 'fruit of the poisonous tree,' and is the primary vehicle which helps to ensure protection from an unreasonable governmental search or seizure." Dickinson, ¶ 19 (citing *State v. Ottwell*, 239 Mont. 150, 154, 779 P.2d 500, 502 (1989)). "The purpose of the exclusionary rule is to 'deter illegal police conduct and preserve judicial integrity.' " *State v. Malkuch*, 2007 MT 60, ¶ 13, 336 Mont. 219, 154 P.3d 558 (quoting *State v. Long*, 216 Mont. 65, 71, 700 P.2d 153, 157 (1985)).

¶49 The three general exceptions to the exclusionary rule are: (1) if the evidence is attenuated from the constitutional violation so as to remove its primary taint; (2) if the

evidence is obtained from an independent source; and (3) if it is inevitable that the evidence would have been discovered apart from the constitutional violation. *Dickinson*, ¶ 19 (citing *State v. Allies*, 186 Mont. 99, 117, 606 P.2d 1043, 1052-53 (1979)). Thus, "[t]he inevitable discovery exception allows the introduction of illegally obtained evidence where the government proves by a preponderance of the evidence 'that the tainted evidence would inevitably have been discovered through lawful means.' " *United States v. Mejia*, 69 F.3d 309, 319 (9th Cir. 1995) (citing *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989); *United States v. Echegoyen*, 799 F.2d 1271, 1280 n. 7 (9th Cir. 1986)).

¶50 The United States Supreme Court adopted the inevitable discovery doctrine in *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501 (1984). In that case, a ten-year-old girl was abducted from a YMCA in Des Moines, Iowa. Shortly after she disappeared, Williams was seen leaving the YMCA carrying a large bundle wrapped in a blanket. Sometime later, several items of clothing belonging to the girl and some of Williams' clothing were found at a rest stop between Des Moines and Davenport, Iowa. The Iowa Bureau of Criminal Investigation initiated a large-scale search for the girl with two hundred volunteers searching the area near the rest stop. *Nix*, 467 U.S. at 434-35, 104 S. Ct. 2504.

¶51 Williams surrendered to the police in Davenport after a warrant was issued for his arrest. Williams contacted an attorney in Des Moines who arranged for an attorney in Davenport to meet Williams at the Davenport police station. The Des Moines police informed counsel that they would pick up Williams in Davenport and return him to Des Moines without questioning him. Two detectives from Des Moines drove to Davenport,

took Williams into custody and proceeded to drive him back to Des Moines. During the trip, contrary to orders, one of the detectives began a conversation with Williams wherein the detective appealed to Williams' "decent human instincts." *Nix*, 467 U.S. at 435-36, 447, 104 S. Ct. at 2504-05, 2510. The detective told Williams that since they would be driving past the area where it was suspected Williams had disposed of the girl's body, they could stop and Williams could show them the exact location of her body so that her parents could give her a Christian burial. Eventually, Williams agreed and he guided the officers to the body which was about two miles from the interstate highway and essentially within the area that was being searched. *Nix*, 467 U.S. at 435-36, 104 S. Ct. 2504-05.

¶52 Thereafter, Williams was indicted for first-degree murder. His counsel moved to suppress evidence of the body and all related evidence on the grounds that it was the fruit or product of Williams' statements made without the benefit of counsel during the trip from Davenport to Des Moines. The motion to suppress was denied and Williams was convicted. *Nix*, 467 U.S. at 436-37, 104 S. Ct. at 2505. Williams' conviction was subsequently reversed by the United States District Court for the Southern District of Iowa on the basis that the officers had obtained incriminating statements from Williams by what was viewed as interrogation in violation of his right to counsel. The United States Supreme Court affirmed in *Brewer v. Williams*, 430 U.S. 387, 97 S. Ct. 1232 (1977), noting that although Williams' incriminating statements could not be introduced into evidence at a second trial, evidence of the body's location and condition "might well be admissible on the theory that the body would have been discovered in any event, even

21

had incriminating statements not been elicited from Williams." *Brewer*, 430 U.S. at 407 n. 12, 97 S. Ct. at 1243 n. 12.

¶53    At Williams' second trial, the prosecution did not offer Williams' statements into evidence, nor did it seek to show that Williams had directed the police to the girl's body. However, evidence of the condition of her body as it was found, articles and photographs of her clothing, and the results of post-mortem medical and chemical tests on the body were admitted. Williams was again found guilty of first-degree murder and sentenced to life in prison. On appeal, the Iowa Supreme Court affirmed holding that even if Williams had not guided police to the girl's body, it would have been found by the search party. *Nix*, 467 U.S. at 439, 104 S. Ct. at 2506.

¶54    The United States Supreme Court agreed with the Iowa Supreme Court and adopted in *Nix* the inevitable discovery exception to the exclusionary rule. *Nix*, 467 U.S. at 448, 104 S. Ct. at 2511. Regarding the exclusionary rule itself, the Supreme Court explained:

> The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections. This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.

*Nix*, 467 U.S. at 442-443, 104 S. Ct. at 2508. And, as to the inevitable discovery exception to the exclusionary rule, the Supreme Court stated:

It is clear that the cases implementing the exclusionary rule begin with the premise that the challenged evidence is in some sense the product of illegal governmental activity. Of course, this does not end the inquiry. If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received.

*Nix*, 467 U.S. at 444, 104 S. Ct. at 2509 (internal citation and quotation marks omitted).

¶55 In general, inevitable discovery most often applies when the investigatory procedures were already in progress prior to the illegal search. *See Nix*, 467 U.S. at 435, 104 S. Ct. at 2504-05 (two hundred volunteers were already searching the area where the child's body had been abandoned before the defendant gave an illegally obtained statement about the exact location of the body); *see also State v. Notti*, 2003 MT 170, 316 Mont. 345, 71 P.3d 1233 (multiple DNA databases matching the defendant to another crime were already established before the search); *Dickinson*, ¶¶ 3-7 (upon speaking with the occupants of a hotel room on another matter, officers observed through the open door the presence of weapons; the officers first secured the room and the weapons before applying for a search warrant); *State v. Lacey*, 2009 MT 62, 349 Mont. 371, 204 P.3d 1192 (defendant's computer containing images of defendant sexually abusing his girlfriend's minor daughter was not searched based on girlfriend's consent, but pursuant to a federal search warrant); *State v. Adkins*, 2009 MT 71, 349 Mont. 444, 204 P.3d 1 (imminent probation search of residence inevitably would have led to discovery of drugs).

¶56 The point is that the evidence seized from S.S.'s bedroom was not the inevitable product of a legal search already in progress as in *Nix*, *Notti*, *Dickinson*, *Lacey* and

23

*Adkins*. The police who responded to Ellis's residence had no authority to search any part of his home, much less seize evidence of a crime which he allegedly committed; the officers were not involved in a legal search already in progress when they seized evidence from S.S.'s bedroom and person.

¶57    In addition, Ellis notes in his brief on appeal that the State's proposal to apply the inevitable discovery doctrine in this case would sabotage the deterrence rationale of the exclusionary rule.  Allowing the introduction of evidence under the inevitable discovery doctrine in this case would "amount to the unacceptable assertion that police would have done it right had they not done it wrong."  *State v. Davolt*, 84 P.3d 456, 469 (Ariz. 2004); *see also State v. Topanotes*, 76 P.3d 1159, 1164 (Utah 2003) ("the argument that 'if we hadn't done it wrong, we would have done it right' is far from compelling") (quoting *United States v. Thomas*, 955 F.2d 207, 210 (4th Cir. 1992)).

¶58    In the instant case, not only was there no attempt to apply for a search warrant, there was no intent to do so.  Detective Holland testified at the suppression hearing that, at the time, he did not feel that he needed a warrant because S.S. admitted the officers into the home.  Detective Holland further stated at the hearing that he still believed he did not need a warrant.

¶59    In *Mejia*, the Ninth Circuit Court of Appeals rejected the contention that the inevitable discovery doctrine applied where law enforcement officers had probable cause to conduct a search, but simply failed to obtain a warrant.  *Mejia*, 69 F.3d at 319.  In so holding, the Court of Appeals explained that it has never applied the inevitable discovery exception

so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant. As we stated in *Echegoyen*, to "excuse the failure to obtain a warrant merely because the officers had probable cause and could have obtained a warrant would completely obviate the warrant requirement."

*Mejia*, 69 F.3d at 320 (citing *Echegoyen*, 799 F.2d at 1280 n. 7; *United States v. Johnson*, 22 F.3d 674, 683 (6th Cir. 1994)). The Court of Appeals further stated:

If evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be *any* reason for officers to seek a warrant. To apply the inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to would in effect eliminate the warrant requirement.

We are neither free nor willing to read the warrant requirement out of the Constitution. Accordingly, even if we assume that the detectives were in possession of competent evidence showing probable cause at the time of the search, the inevitable discovery doctrine would not justify introduction of the evidence seized without a warrant.

*Mejia*, 69 F.3d at 320 (emphasis in original).

¶60 Based on the foregoing, we conclude that the evidence seized from Ellis's residence, with the exception of S.S.'s underwear, must be suppressed because they were the product of an illegal search and seizure. Although the State indicated at oral argument before this Court that S.S. had turned over her underwear to the officers at the stationhouse, in fact, all of the evidence seized, including her underwear, were taken from the residence by the officers. At the suppression hearing, Detective Holland testified as follows:

Q. [by Deputy County Attorney] . . . Now, you indicate that after taking the photographs you recovered the items from the victim's bedroom. What specifically did you recover?
A. We recovered a pajama top, a pajama bottom, upper sheet, fitted sheet, a multicolored comforter, knitted, and a green fluffy comforter, and the victim's underwear.

25

Q. Okay. And all these were located from this one bedroom.

A. All were located in the one bedroom. The victim actually had the underwear on at the time. And while Captain Conway and I were there, we had her – she changed clothes and we took the underwear. But everything else was in the room, yes.

¶61 Nevertheless, we conclude that Ellis did not have an actual subjective expectation of privacy that society would find objectively reasonable in the underwear that S.S. was wearing at the time the alleged assault occurred. *Goetz*, ¶ 27.

¶62 Accordingly, we hold that the District Court did not err in granting Ellis's motion to suppress all of the evidence, with the exception of S.S.'s underwear.

¶63 That said, the dissents have raised several contentions that require a response. First, Justice Leaphart argues that no search occurred in this case. Dissent, ¶ 80. On the contrary, this Court has repeatedly stated that a search is " 'the use of some means of gathering evidence which infringes upon a person's reasonable expectation of privacy.' " *Goetz*, ¶ 25 (quoting *Hardaway*, ¶ 16); *see also State v. Elison,* 2000 MT 288, ¶ 48, 302 Mont. 228, 14 P.3d 456. Here, Officer Murphy testified at the suppression hearing that *he asked* S.S. to show him where the alleged assault took place. Moreover, law enforcement officers entered the second floor of the home not once, but three times, to gather evidence. In doing so, they photographed the bedroom and its contents before taking the bedding and clothing. Clearly, a search occurred in this case.

¶64 Furthermore, there were no exigent circumstances here—no threat of violence or destruction of evidence existed. The District Court noted in its order suppressing the evidence that

26

> [d]efendant already had been detained before investigators seized the victim's bedding and clothing from her bedroom. There was no danger of loss or destruction of the evidence if investigators had waited to apply for and obtain a search warrant.

In fact, the officers had a four-hour window—from the time they arrived on the scene until the time they released Ellis after interrogating him—in which the officers could have obtained a search warrant.

¶65  Second, Justice Leaphart argues that this was merely a "delivery" and he cites to several cases wherein evidence was simply turned over to law enforcement officers. Dissent, ¶ 80. However, unlike the instant case, only one of the cases cited by Justice Leaphart involved gathering evidence from *inside* the defendant's home, and in two of the cases, it was the defendant that "delivered" the evidence to the officers.

¶66  In *State v. Arthun*, 274 Mont. 82, 906 P.2d 216 (1995), officers were tracking a UPS parcel that they knew contained illegal drugs. They obtained a warrant to search defendant's residence, but, failing to find the parcel in the house, they asked defendant where it was. Defendant led the officers to a storage shed where they retrieved the parcel. *Arthun*, 274 Mont. at 84-86, 906 P.2d at 217-18. Similarly, in *State v. Graves*, 191 Mont. 81, 622 P.2d 203 (1981), *overruled in part by State v. Archambault*, 2007 MT 26, 336 Mont. 6, 152 P.3d 698, the defendant had been involved in a fight wherein one person was stabbed. Sometime later, an officer approached the defendant as he was walking down the street and asked him if he was the one that had been involved in the fight and if a knife was used. The defendant responded affirmatively and handed the knife to the officer. *Graves*, 191 Mont. at 83-85, 622 P.2d at 205-06.

¶67 Conversely, in *State v. Carlson*, 198 Mont. 113, 644 P.2d 498 (1982), two officers appeared at the defendant's door with what later turned out to be an invalid arrest warrant. In making the arrest, the officers entered the defendant's front room where they observed drug paraphernalia. The officers did not seize or touch anything at that time. They later returned to the house with a search warrant. That search produced drugs and a stolen pistol. This Court held that the original entry into defendant's home was unlawful and that the officers' visual observations of drug paraphernalia inside the home constituted an unconstitutional search. *Carlson*, 198 Mont. at 115-117, 125, 644 P.2d at 499-500, 504.

¶68 In this case, S.S. did not "deliver" the items to the officers, with the exception of her underwear. The officers walked through the house to an upstairs bedroom where they collected the evidence after photographing it.

¶69 Third, Justice Leaphart also relies on the United States Supreme Court's decision in *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515 (2006), pointing out that the police have the authority to enter a dwelling to protect a resident from domestic violence, and in doing so, they may seize any evidence in plain view. Dissent, ¶ 79. Contrary to Justice Leaphart's implication, there was no one else at the residence at the time Officer Murphy arrived, thus there was nothing and no one that Officer Murphy needed to protect S.S. from. In fact, if Officer Murphy and Detective Holland believed that S.S. needed protecting, they would not have left her alone downstairs in the living room while they searched her bedroom.

¶70 Furthermore, the evidence obtained from the bedroom was not in "plain view" as this Court has defined that term. The "plain view" doctrine requires that not only must the officers be lawfully located in a place from which the object can be plainly seen, but they must also have a lawful right of access to the object itself. *Loh*, 275 Mont. at 473, 914 P.2d at 598 (citing *Horton v. California*, 496 U.S. 128, 136-37, 110 S. Ct. 2301, 2308 (1990)). While Officer Murphy may have "legitimately" been in the living room as Justice Leaphart contends, that did not give Officer Murphy free access to the remainder of the house. In addition, Officer Murphy testified at the suppression hearing that he did not see any evidence of a crime from where he was in the living room.

¶71 Fourth, in his dissent, Judge Simonton argues that *Schwarz* was wrongly decided and that it should be overruled. Dissent, ¶ 88. While counsel for the State requested at oral argument that this Court overrule *Schwarz*, the State argued in the lower court and in its brief on appeal to this Court, that *Schwarz* need not be overruled. Instead, the State asked that we create an exception for child victims. We are not inclined to relitigate *Schwarz* in this case as *Schwarz* was founded on solid legal grounds. Furthermore, contrary to the arguments in both dissents, the fact that a child may be a victim of a crime does not prevent law enforcement officers from investigating that crime and in searching a residence after obtaining the proper warrant.

¶72 Fifth, Judge Simonton also contends that in *Schwarz* and in the instant case, we failed to observe the rights of minors as set forth in Article II, Section 15 of the Montana Constitution. Dissent, ¶¶ 88, 100. While the drafters of the Constitution certainly intended to provide those Montana citizens under eighteen years of age with all of the

29

fundamental rights afforded to adults in Montana, they did not intend to eliminate the right of parents to govern their children. As Delegate Dahood pointed out:

> There is a constitutional controversy throughout this land as to whether or not the basic protections of the Bill of Rights shall be applied to those persons who are not adults, with respect to arrest, detention and trial. We are not, in this situation, affecting in any way the relationship of parent and child or of guardian and ward with respect to someone under the age of majority.

Montana Constitutional Convention, Verbatim Transcript, March 8, 1972, p. 1751.

¶73 In closing, it, again, bears emphasizing that in Montana "warrantless searches conducted inside a home are *per se* unreasonable, subject only to a few specifically established and well-delineated exceptions." *McLees*, ¶ 10. Both the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect citizens against unreasonable searches and seizures, and require warrants issued upon probable cause prior to a search by law enforcement officials. Warrantless searches are considered *per se* unreasonable unless an exception to the warrant requirement applies. *State v. Ruggirello*, 2008 MT 8, ¶ 17, 341 Mont. 88, 176 P.3d 252 (citing *State v. Case*, 2007 MT 161, ¶ 19, 338 Mont. 87, 162 P.3d 849). Indeed, the fundamental purpose—the *raison d'etre*—for the constitutional guarantee against unreasonable searches and seizures is to protect the privacy and security of individuals and to safeguard the sanctity of the home against arbitrary invasions by governmental officials. *Dorwart v. Caraway*, 1998 MT 191, ¶ 21, 290 Mont. 196, 966 P.2d 1121, *overruled on other grounds by Trustees of Indiana University v. Buxbaum*, 2003 MT 97, 315 Mont. 210, 69 P.3d 663 (citing *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730

(1967); *State v. Gray*, 152 Mont. 145, 149, 447 P.2d 475, 477 (1968)). "The home is the most sanctified of all 'particular places' referred to in the Fourth Amendment," *State v. Graham*, 2004 MT 385, ¶ 22, 325 Mont. 110, 103 P.3d 1073, and it is for that reason that the exceptions to the warrant requirement are, concomitantly, jealously guarded and carefully drawn. These exceptions include: consent, freely and voluntarily given, *State v. Bieber*, 2007 MT 262, ¶ 29, 339 Mont 309, 170 P.3d 444; a search incident to a lawful arrest, *Hardaway*, ¶ 36 (citing § 46-5-102, MCA); and exigent circumstances coupled with probable cause, *State v. Stone*, 2004 MT 151, ¶ 18, 321 Mont. 489, 92 P.3d 1178.

¶74 Within the context of this case, none of these exceptions apply. Here, the police had every opportunity to obtain a warrant to seize evidence within Ellis's home; they simply chose not to. Rather, they chose the expedient route over the constitutional one. Justice Brandeis observed in *Olmstead v. United States,* 277 U.S. 438, 485, 48 S. Ct. 564, 575 (1928) (Brandeis, J., dissenting):

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means . . . would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.

¶75 Importantly, if this Court refuses to scrupulously uphold and enforce the guarantees of the Fourth Amendment and Article II, Sections 10 and 11, then, we can be assured that no other branch of government will. By parsing the protections of the Fourth

31

Amendment and Article II, Sections 10 and 11; by creating fact-oriented exceptions to the warrant requirement to justify a palatable result in the hard case; and by refusing to hold the police to the clearly defined rule that, especially in the home, warrantless searches and seizures are *per se* unreasonable, we enable—indeed, we encourage— precisely the contempt for the law against which Justice Brandeis warned. And, if this structure of enablement remains unchallenged and unchanged, then the criminal justice system will always end up re-creating fundamentally the same mistakes, the same evils, the same dysfunction, and the same violations of our citizens' constitutional rights.

¶76     Affirmed in part, reversed in part and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA COTTER
/S/ JOHN WARNER

/S/ DIRK M. SANDEFUR
District Court Judge Dirk M. Sandefur
sitting for Chief Justice Mike McGrath

Justice W. William Leaphart, dissenting.

¶77     The Court concludes that William Bruce Ellis, Jr. (Ellis) had a reasonable expectation of privacy in the pajamas and bedding that his daughter was wearing and sleeping in at the time of the assault. As to the victim's panties, the court reverses,

32

concluding that: "The focus is not on the general privacy rights of the child—except where, as with the underwear that S.S. was wearing during the alleged assault—society would recognize as reasonable a person's privacy interest in the intimate apparel that she or he was wearing at the time." *Opinion*, ¶ 35.

¶78 I agree with the Court's conclusion that society would recognize as reasonable a person's privacy interest in the intimate apparel that she or he was wearing at the time of the assault and that, "Ellis did not have an actual subjective expectation of privacy that society would find objectively reasonable in the underwear that S.S. was wearing at the time the alleged assault occurred." *Opinion*, ¶ 61. Having recognized S.S.'s expectation of privacy in her underwear, and Ellis's lack of such expectation, the Court fails to follow through on its own logic. First, the Court has recognized that, although the defendant may have a right of privacy in the house, that does not necessarily mean he has a privacy interest in all the contents (e.g. his daughter's underwear). Secondly, if S.S. had a reasonable expectation of privacy in the "intimate apparel that she was wearing" at the time of the assault, why does she not have that same expectation of privacy in the pajamas that she was wearing at the time or the bedding that she was sleeping in at the time of the assault? Are they somehow less "intimate" in a constitutional sense? If so, the distinction escapes me.

¶79 As to the question of whether the officer engaged in a search upon entering the living room to talk with S.S., I do not think that it was unreasonable for Officer Murphy, who, in responding to a call about a sexual assault, approached the house not knowing that the victim was a minor and not knowing that the alleged assailant was her father or

33

who else, if anyone, was in the house. It cannot seriously be argued that it was unreasonable for the officer to enter the living room at S.S.'s request to talk with her. Officer Murphy was legitimately in the house. As the United States Supreme Court recognized in *Georgia v. Randolph*, 547 U.S. 103, 118, 126 S. Ct. 1515, 1525 (2006):

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur, however much a spouse or other co-tenant objected. **(And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause,** *see Texas v. Brown***, 460 U.S. 730, 737-39, 103 S. Ct. 1535 (1983) (plurality opinion).)**

(Emphasis added.) The question before the Court is whether items seized were fruits of a search or were items in which S.S. had a reasonable expectation of privacy and which she voluntary turned over to the police.

¶80    The items in question (bedding, pajamas, and underwear) were not discovered by virtue of a search. Evidence received by way of delivery is not a search; "[a] 'search' is a prying into hidden places for that which is concealed . . . ." *State v. Arthun*, 274 Mont. 82, 906 P.2d 216, 220 (1995) (citing *State v. Carlson*, 198 Mont. 113, 118-19, 644 P.2d 498, 501 (1982)). In *Arthun*, we held that the officers had not conducted an independent inspection of the farm shed. Rather, they entered the shed at the defendant's invitation and "retrieved the box which Bruce located for them." We concluded that "there was no prying or investigation, and thus no 'search' so as to implicate either the Fourth

34

Amendment or the Montana Constitution." In *State v. Graves*, 191 Mont. 81, 622 P.2d 203 (1981) (overruled on other grounds), the defendant had been involved in a knife fight. An officer approached him and asked if he had been involved in the fight. Graves said yes, he had. The officer asked if a knife had been involved. Graves said yes and turned the knife over to the police in response to the officer's inquiry. The Court held there was no search.

¶81 The officers in the present case did not have to conduct a search for the items at issue. They opened no cupboards, closets, or drawers in order to find them. Rather, S.S. showed the officer her bedroom, retrieved her pajamas, bedding and underwear, and relinquished them to the officer.

¶82 The Court relies heavily on our decision in *State v. Schwarz*, 2006 MT 120, 332 Mont. 243, 136 P.3d 989. The question in *Schwarz* was whether a minor child had the capacity to waive the parent's right of privacy. Unlike this case there was no issue as to whether the child had a superior expectation of privacy in any of the items seized. We did say in *Schwarz* that "the child has privacy at the discretion of the parent." *Schwarz*, ¶ 13.

¶83 We have previously recognized that once a person voluntarily relinquishes or abandons his property, his expectation of privacy in that property is abandoned as well. *See State v. 1993 Chevrolet Pickup*, 2005 MT 180, ¶¶ 14-15, 328 Mont. 10, 116 P.3d 800. The owner's intent with respect to the property, as determined by his actions or statements, establishes whether the owner has abandoned his property. The same reasoning applies in the present case. Assuming for sake of argument that Ellis bought

the bedding, pajamas, and underwear in question and thus, had a proprietary interest in them, he voluntarily relinquished any expectation of privacy in those items when he gave them to S.S. to wear and sleep in. From that point on, society would undoubtedly recognize that S.S. had a reasonable expectation of privacy—not just in the underwear, but also in the bedding and the pajamas she was wearing. Conversely, once Ellis relinquished the items to S.S., he gave up his control of the items and could no longer claim a reasonable expectation of privacy in his daughter's panties, bedding, or pajamas. As the owner of the home, Ellis could seek to suppress any foundational testimony from the officers about what they saw while in the bedroom or any pictures they took in the home. However, because Ellis did not have a reasonable expectation of privacy in the items themselves, he has no standing to challenge the seizure of those items.[1]

¶84    The Court draws the bold conclusion that "S.S. was not asserting her own constitutional rights, rather, she was attempting to waive her father's constitutional right to privacy." *Opinion*, ¶ 35. This is a puzzling conclusion indeed. One would normally conclude that a young girl in S.S.'s situation was concentrating on her own welfare rather than the rights of her alleged assailant. S.S. is a minor who enjoys all the fundamental constitutional rights of an adult. *See* Mont. Const. art. II, § 15. In summoning the police and showing them the evidence that she had been assaulted, she was not seeking to waive her father's right to privacy. Rather, she was waiving her own rights of privacy and

---

[1] Assume A is an overnight guest in B's house. Unbeknownst to A, B hides some contraband in A's suitcase. The police enter the home without a warrant and search the home. With A's consent, they search the suitcase. Does B, as the owner of the home, have an expectation of privacy in A's suitcase sufficient to support standing to suppress the fruits of the search? I think not.

exercising her fundamental right to "defend her life and liberty," "to seek her safety, health and happiness" under Article II, Section 3 of the Montana Constitution, and her right to individual dignity under Article II, Section 15 of the Montana Constitution.

¶85    As indicated above, I believe that *Schwarz* is distinguishable in that the evidence here was not the fruit of a "search" of the home, and, secondly, Ellis had no reasonable expectation of privacy in the evidence.  However, to the extent that *Schwarz* is interpreted as dictating the result reached by the Court, I would endorse a victim's exception to the per se rule that a minor cannot consent to the search of her parents' home.  The exception would be limited to crimes against the person, Title 45, chapter 5, MCA, that were alleged to have been committed against the minor which occurred in the home in question.  There should be a distinction between situations in which a minor consents to a search, essentially acting as a third party as between the parent and law enforcement and situations in which the minor, as a first party victim, consents to a search in the interest of asserting her own rights of safety, well-being, and privacy.

¶86    In an apparent effort to foreclose a "victim exception" to the per se rule, the Court suggests that in *Schwarz* "we considered the possibility of a child calling the police to report a crime" when we cited to the case of *Abdella v. O'Toole*, 343 F. Supp. 2d 129 (D. Conn. 2004).  *Opinion*, ¶ 40.  The *Abdella* case, however, was cited for the very narrow proposition that the majority of courts hold that "there is no *per se* rule that all minors lack the authority to consent to a search."  *Schwarz*, ¶ 11.  Notably, the *Schwarz* Court rejected that majority position.  Secondly, *Schwarz* does not discuss the particular facts or holding in *Abdella*.  Finally, in *Abdella*, law enforcement officers, looking for Jim

37

Abdella on suspicion of theft, knocked on the door of the Abdella home. Jim's 11-year-old sister Regina answered and arguably consented to their searching the house for her brother. Regina was neither a victim of nor a witness to a crime, nor had she reported a crime. To suggest that by citing to *Abdella* in *Schwarz* this Court has considered and rejected a victim's exception to the per se rule, strains the holding in *Schwarz* beyond recognition.

¶87 I conclude that Ellis had no reasonable expectation of privacy in his daughter's pajamas, bedding, or underwear. In the alternative, to the extent he does have such an expectation, I would adopt a victim exception to the *Schwarz* per se rule. I would reverse the order of suppression.

/S/ W. WILLIAM LEAPHART

Justice Brian Morris joins in the dissenting Opinion of Justice W. William Leaphart.

/S/ BRIAN MORRIS

District Court Judge Richard A. Simonton, dissenting.

¶88 I agree with Justice Leaphart's dissent, and I feel the Court should take this opportunity to abandon the per se rule of *State v. Schwarz*, 2006 MT 120, 332 Mont. 243, 136 P.3d 989, for two reasons. First, it is inconsistent with Montana law and our analysis of consent-to-search cases. Rather than perpetuating bad law, the Court should use this opportunity to return to the totality of the circumstances approach.

38

Secondly, holding that a child of thirteen may not invite officers into her home and may not give them evidence that supports her allegation that her father sexually abused her violates her constitutional rights. The Montana Constitution demands that all individuals be provided equal protection under the law and secures to them all fundamental rights whether they be thirteen or sixteen years of age.

¶89 With the exception of *Schwarz*, this Court has consistently applied a totality of the circumstances test to discern whether the person providing consent had common authority and if that consent was provided voluntarily. *State v. Clark*, 2008 MT 419, ¶ 27, 198 P.3d 809, 347 Mont. 354 (citing *State v. McLees*, 2000 MT 6, ¶ 17, 298 Mont. 15, 994 P.2d 683). For example, in *State v. Lacey*, 2009 MT 62, ¶ 41, 349 Mont. 371, 204 P.3d 1192, we considered whether the area searched and items seized were marked, labeled, locked, or otherwise set apart. We also questioned whether members of the household had limited access to the area searched or if it was a communal space. *Lacey*, ¶ 41. Further, in *State v. DeWitt*, 2004 MT 317, ¶ 30, 324 Mont. 39, 101 P.3d 277, we reflected upon whether all of the occupants of the residence used or had general access to the area searched.

¶90 The goal of this multi-factor approach is to determine whether there is a sufficient relationship between the person providing consent and the area to be searched. *McLees*, ¶ 17; *State v. Sorenson*, 180 Mont. 269, 275-76, 590 P.2d 136, 140 (1979). As we stated in *McLees*, the authority which justifies consent rests upon:

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right

and that the others have assumed the risk that one of their number might permit the common area to be searched.

*McLees*, ¶ 13 (quoting *U.S. v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974)). In short, when a person allows a third party significant latitude in using or accessing his property, we have held it is reasonable to conclude the owner assumed the risk that the third party would assert control over the premises. *See McLees*, ¶ 17; *Lacey*, ¶ 41.

¶91    *Schwarz* marked the first time this Court did not look at all of the key facts of the case to discern whether the consenting party possessed the requisite authority to provide consent.   Rather than following this well-established process for analyzing consent, the Court in *Schwarz* zeroed in on one fact--the age of the consenting party.  It did so even after acknowledging that the majority of courts in other jurisdictions, which addressed whether a youth could provide consent to search, concluded there was no per se rule that age prevents consent, and these courts declined to create one.  The Court refused to follow the majority, concluding that several of those courts relied upon the doctrine of apparent authority, a doctrine we rejected in *McLees*. However, the majority of those courts did not rely upon the doctrine of apparent authority, and found actual authority for a minor child to consent.  *See In re Anthony F.*, 442 A.2d 975 (Md. 1982); *Iowa v. Folkens*, 281 N.W.2d 1 (Iowa 1979); *Ill. v. Swansey*, 379 N.E.2d 1279 (Ill. App. 1978); *Kan. v. Kriegh*, 937 P.2d 453 (Kan. App. 1997); *Reynolds v. Tex.*, 781 S.W.2d 351 (Tex. App. 1989); *Doyle v. Alaska*, 633 P.2d 306 (Alaska App. 1981); *Hembree v. Tenn.*, 546 S.W.2d 235 (Tenn. Crim. App. 1976); *Rajappa v. Ga.*, 408 S.E.2d 163 (Ga. App. 1991); *Minn.*

*v. Lottan*, 527 N.W.2d 840 (Minn. App. 1995). Oregon, like Montana, rejected the doctrine of apparent authority and includes age as only one factor to determine whether a third party has actual authority to provide consent to search. *Or. v. Will*, 885 P.2d 715 (1994). More importantly, we did not abandon the totality of the circumstances approach in *McLees*. The decisions of these other jurisdictions support the continued use of Montana's approach that youth is only one of many factors to be considered in determining whether the State obtained lawful consent. *Schwarz*, ¶ 11.

¶92 *Schwarz* is premised, in part, on the Court's observation of disparity between a parent's authority and a child's authority over shared property. *Schwarz*, ¶ 13. The Court accepted California's conclusion that parents retain control of the family home and have the power to rescind any authority they give away. *Schwarz*, ¶ 13. Otherwise stated, if parents can give away certain authorities, those authorities should remain with the child until the extension of authority is rescinded. Yet by its adoption of a per se rule, the Court eliminated the possibility that a parent could grant their child certain authority and decide not to rescind it. Since the Court accepted California's construction of transitory authority, the Court should have looked at the facts of the case to determine whether Schwarz relinquished a sufficient amount of authority to her child, and if she ever rescinded that delegation. That is not what happened. The Court never assessed the degree of authority Schwarz may have extended to her daughter or whether it had been revoked.

¶93 In addition, we have never required a third party to have *equal authority* over the property to be searched, but reviewed the facts to determine whether the third party

41

enjoyed some *common authority*. We specifically rejected the argument that payment of living expenses, such as rent and utilities, indicated actual authority, and directed our attention to facts that indicated whether the third party maintained free access to the area as a cohabitant. *McLees*, ¶ 17; *see also Lacey*, ¶ 40. While all children depend upon a parent or guardian to provide them with necessities, the age at which children gain independence and acquire substantial responsibility for their own care and that of other members of the household changes according to each family's unique situation. The Court fails to recognize that.

¶94 Today the Court repeats the mistake it made in *Schwarz* by ignoring the law established in Montana, reiterated only days earlier in *Lacey*, that consent is a waiver of the consenter's rights, not of any other person. The Court declares, "In this case and in *Schwarz*-type cases, however, the focus is on the violation of the privacy rights of the parents." *Opinion*, ¶ 36. Apparently *Schwarz*-type cases are cases where the Court ignores its own precedent, for recently we reiterated in *Lacey* that third-party consent rests on the assumption that the party provided consent "in his own right," not on the rights of others who were not present and may or may not have elected to withhold consent. *Lacey*, ¶ 37.

¶95 Apart from my disagreement with the Court's approach to analyzing consent-to-search cases involving a minor, I am confused at the Court's decision that a person cannot assert his or her own right to privacy until he or she reaches the age of sixteen. We are left to wonder why the Court chose sixteen, for the decision does not explain why at sixteen a child acquires sufficient capacity or is able to use the house to such a

degree that he or she can then provide lawful consent.

¶96     Obviously, looking for a basis to justify its age limitation, the Court cited § 41-5-331, MCA, which prohibits law enforcement from interrogating a youth under the age of sixteen unless a parent has permitted it or an attorney has advised it.  It then stated:

> Although Section 41-5-331, MCA, only addresses a youth's constitutional right against self-incrimination, it nonetheless supports the principle that a minor who cannot waive her own rights without parental permission or legal counsel, cannot waive her parent's privacy rights.

*Schwarz*, ¶ 14.   The Court could just as well have referred to the various statutes concerning sex offenses and the inability of a child under sixteen to consent to sex.   Section 45-5-501, MCA.   Notably both §§ 41-5-331 and 45-5-501, MCA, are meant to protect the youth, not the parent.   These statutes are meant to enhance a youth's rights; not dilute them in favor of another person's rights.

¶97     The legislature has often placed children between the ages of twelve and sixteen on the same footing as adults.   For example, the consent of a child twelve years of age or older is required for an adoption, and once a child reaches the age of fourteen years, he or she has the right to request an amendment of a parenting plan.   Sections 42-2-301 and 40-4-219, MCA.   A child of twelve can be sentenced as an adult for certain crimes.   Section 41-5-206, MCA.   The legislature obviously feels that, in certain cases, a twelve year old has the capacity to commit a crime and be prosecuted as an adult.

¶98     To forbid a child under the age of sixteen, who is sexually abused by her father, to provide physical evidence corroborating her report, does not help the child; it strips the child of her own rights and enhances her abuser's rights.   Such a hard and fast rule is

inconsistent with the concept of capacity and inconsistent with the legislature's purposes in protecting children.

¶99  One of the consequences of a per se rule that fails to consider the possibility of exceptions, such as *Schwarz*, is that it can render unfair consequences. Here, the Defendant's thirteen-year-old daughter, who resides with him, called the police and told them her father may have assaulted her. Police responded by going to the house and were invited in by the alleged victim. This simple and reasonable entry into the house is illegal according to the Court. Once through the front door, law enforcement questioned the girl about her call. The girl advised the officer that her father had sexually assaulted her and she then showed him her bedroom where the crime was committed, her bedding upon which she was violated, and the pajamas she wore during the assault. She allowed the officers to take the bedding, pajamas, and underwear to be analyzed in order to corroborate her story. Her father had no expectation of privacy in those items, but the Court declares that this was an unreasonable seizure of the pajamas and bedding because there was no search warrant, and suggests the girl could have taken those items to the police as they were standing outside the house, or she could have taken them to the police station. That the girl could have apparently invited her friends into the house and her bedroom, or a pizza delivery person into the home appears insignificant to the Court. That the girl had the authority to preclude her friends and others, besides her father, from her bedroom seems to carry no weight because she was under the age of sixteen.

¶100  It is ironic that the Court touts Montana's elevated right to privacy as justification

for the per se rule, in light of the Constitution's explicit focus on the child's own rights and the protection thereof.  Article II, § 15 of the Montana Constitution provides that persons under eighteen years have all of the fundamental rights of Article II, including the § 11 right to be free "from unreasonable searches and seizures", unless specifically precluded "by laws which enhance the protection of such persons."  Montana Constitution, Article II, § 3 includes the right to enjoy and defend one's life and liberty and the right to seek one's safety.  Article II, § 4 of the Montana Constitution includes the right to dignity stating that it is "inviolable" and precluding the denial of equal protection under the law.  The Court ignores those rights and their application to a thirteen-year-old girl by insisting that the father's rights are more important than finding evidence to determine whether a sexual assault has been committed against the girl by her father in her own home.

¶101   The Court has failed to consider that the legislative adoption of a particular age is to protect children.  Furthermore, today's decision poses grave consequences to a child's own right to seek protection under the law, even when her own parents defy it.  The Montana Constitution was never meant to provide a safe haven for defendants charged with committing crimes against children.

¶102   The special facts of this case would have been considered in determining whether the police acted reasonably, had the Court not abandoned the totality of circumstances test.  The Court should return to it.

/S/ RICHARD A. SIMONTON
District Court Judge Richard A. Simonton
sitting in for Justice Jim Rice

45